Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Kristine Akland
AKLAND LAW FIRM, PLLC
PO Box 7274
Missoula, MT 59807
(406) 544-9863
aklandlawfirm@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES, Plaintiffs, | CV- |
| vs. | COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |
| LEANNE MARTEN, Regional Forester, USFS Region One, U.S. FOREST SERVICE, and U.S. FISH & WILDLIFE SERVICE, Defendants | |

## I. INTRODUCTION

1.     This is a civil action for judicial review under the citizen suit provision of
       the Endangered Species Act and the Administrative Procedure Act of the
       U.S. Forest Service's (USFS) and U.S. Fish and Wildlife Service's (FWS)
       authorizations of the North Hebgen Project (Project) on the Gallatin portion
       of the Custer-Gallatin National Forest (Forest), and Amendment 51 to the
       Gallatin National Forest Land and Resource Management Plan (Forest Plan).

2.     Plaintiffs Alliance for the Wild Rockies and Native Ecosystems Council
       attest that the decisions approving the Project and Amendment 51 are
       arbitrary and capricious, an abuse of discretion, and/or otherwise not in
       accordance with law.

3.     Defendants' approval of the Project and Amendment 51 and corresponding
       documents or lack thereof as written violate the National Environmental
       Policy Act (NEPA), 42 U.S.C. §4331 et seq., the National Forest
       Management Act (NFMA), 16 U.S.C. §1600 et seq., the Endangered Species
       Act (ESA), 16 U.S.C. §1531 et seq, and the Administrative Procedure Act
       (APA), 5 U.S.C. §§ 701 et seq.

4.     Plaintiffs request that the Court set aside and remand the Project decision
       and Amendment 51 pursuant to 5 U.S.C. §706(2)(A) and 16 U.S.C.
       §1540(g), and that the Court enjoin implementation of the Project.

5.     Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs, and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412, and the ESA, 16 U.S.C. §1540(g)(4), and such other relief as this Court deems just and proper.

## II. JURISDICTION

6.     This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

7.     An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Gallatin National Forest for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

8.     The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, ESA, and the APA. The requested relief would

redress these injuries and this Court has the authority to grant Plaintiffs'
requested relief under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 &
706.

9.   Plaintiffs sent a notice of intent to sue under the ESA regarding their
challenge to Amendment 51 to USFS, FWS, the Department of the Interior,
the Department of Agriculture, and the Department of Justice on July 14,
2017.  Thus, Plaintiffs have complied with the 60-day notice requirement for
their ESA challenge to Amendment 51 and this Court has jurisdiction to
review this claim

10.   Plaintiffs submitted timely written comments concerning the Project and
Amendment 51 and fully participated in the available administrative review
processes; thus they have exhausted administrative remedies. Thus, the
Court has jurisdiction to review Plaintiffs' APA claims.

### III. VENUE

11.   Venue in this case is proper under 28 U.S.C. §1391(e) and Local Rule
3.3(a)(1). Defendant Marten, the chief representative for USFS Region One,
and the chief representative of the USFS in Montana, resides within the
Missoula Division of the United States District Court for the District of
Montana.

IV. PARTIES

12. Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Gallatin National Forest. Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems by approving the challenged Project and Amendment 51.  Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

13. Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of natural resources on public lands in the Northern Rockies. Its members use and will continue to use the Gallatin National Forest for work and for outdoor

recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. USFS's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Gallatin National Forest, including the Project area. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

14.   Defendant LEANNE MARTEN is the Regional Forester for the Northern Region/Region One of the USFS, and in that capacity is charged with ultimate responsibility for ensuring that decisions made at each National Forest in the Northern Region, including the Custer-Gallatin National Forest, are consistent with applicable laws, regulations, and official policies and procedures.

15.   Defendant UNITED STATES FOREST SERVICE (USFS) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Custer-Gallatin National Forest.

16.   Defendant UNITED STATES FISH AND WILDLIFE SERVICE (FWS) is an administrative agency within the U.S. Department of Interior and is responsible for lawful management of species listed under the Endangered Species Act.

## V. PROCEDURAL BACKGROUND

17.   USFS signed the Decision Notice authorizing the Project on June 29, 2017.

18.   USFS sent a Biological Assessment for the Project to FWS on December 16,

2016, and received a Biological Opinion for the Project on May 17, 2017.

19.   USFS signed the Decision Notice for Amendment 51 on November 2, 2015.

20.   USFS produced a Biological Assessment for Amendment 51 on April 28,

2015, and received a Biological Opinion from FWS for Amendment 51 on

October 2, 2015.

## VI. FACTUAL ALLEGATIONS

A.  PROJECT AREA

21.   The Project area is in the Greater Yellowstone Area and abuts Yellowstone

National Park.

22.   The Project area is located in the Tepee Creek drainage south of the Cabin

Creek Wildlife Management Area to the Madison Arm of Hebgen Lake, and

from the Yellowstone National Park Boundary west to the Horse Butte

peninsula and the vicinity of Red Canyon on the North side of Hebgen Lake.

23.   Project units are proposed in portions of sections 24-26, 35, 36, T 11 S, R 04

E; sections 17, 19, 20, 29-34, T 11 S , R 05 E; sections 2, 11, 13, 15, 22-27,

35, 36, T 12 S, R 04 E; Sections 3-6, 8-10, 19-22, 27-34, T 12 S, R 05 E and

Sections 3, 4 , 10, T 13 S, R 05 E.

24.     The Project area also includes portions of the Madison 1-549 Inventoried

        Roadless Area.

25.     The Project area, which is defined by the outer boundaries of all units, is on

        the Hebgen Lake District of the Custer-Gallatin National Forest and is

        approximately 73,250 acres.

26.     Elevation in the Project area ranges from approximately 6,400 feet to over

        10,300 feet. The analysis area is about 74% forested.  Subalpine fir mix and

        the lodgepole pine mix forest dominance types dominate the analysis area.

27.     The Project occurs within the Yellowstone Grizzly Bear Recovery Zone

        (also referred to as the Primary Conservation Area) within the Madison Bear

        Management Unit, including within subunits Madison #1 and Madison #2.

28.     The Project also occurs within the Upper Madison Lynx Analysis Unit.

29.     The Project also occurs within the Buffalo Horn, Cabin Creek, and Henry's

        Mountains Elk Analysis Units.

30.     The Project also occurs within the Madison and Henry's mountain ranges.

B.  PROJECT

31.     The Forest Supervisor selected Environmental Assessment Alternative 2

        with modifications for the Project.

32.     The Project includes up to 5,670 acres of commercial and non-commercial

logging:  3,306 acres of commercial logging, 127 acres of powerline thinning, 177 acres of post and pole thinning, 137 acres of hand thinning, 1,076 acres of precommercial thinning, and 843 acres of thinning around Whitebark pine.

33.   The Environmental Assessment estimates that the Project allows the logging of up to 908 acres of actual and potential old growth forest in the Project area, all within the Madison Mountain Range.

34.   The Project also includes 15.6 miles of new, temporary road construction.

35.   The Project will also use 43.6 miles of existing roads, although the Environmental Assessment does not specify how many miles of road are closed roads that will be reopened.

36.   There is extensive past logging in the Little Teepee drainage.  The Project includes a site-specific Forest Plan amendment to exempt the Project from complying with Forest Plan Amendment #45 (Travel Plan) Standard E-4 in Little Teepee Creek and Red Canyon Creek.  The standard for Class A streams, which include native cutthroat streams, limits instream fine sediment to 26% maximum: Little Teepee Creek currently has 34.1% instream fine sediment and the Project will increase it to 38.7%; Red Canyon currently has 28.5% instream fine sediment and the Project will increase it to 29.0%.

37.   During the Project, USFS says it will barricade or gate or "sign" temporary Project roads "as needed" to prevent public use of roads opened to logging contractors and administrators.

38.   USFS estimates that it will take 8-12 years to fully implement the Project.

C.  PROJECT EFFECTS ON GRIZZLY BEARS

39.   The Interagency Grizzly Bear Study Team has established that the Project area is located within the home range of a substantial number of grizzly bears.

40.   Interagency Grizzly Bear Study Team has documented 31 GPS locations (between 2005-2012) from 7 individual grizzly bears (2 females, 5 males) recorded inside the proposed Project timber harvest units. The seven individual grizzly bears were 1 female with a yearling, 1 subadult female, 1 subadult male, and 4 adult males.

41.   During implementation, the Project will reduce secure habitat for grizzly bears within the Madison Bear Management Unit.

42.   In Madison # 2 Subunit, which was previously identified by the agencies as a Subunit in need of improvement due to its already degraded baseline condition for secure habitat, the Project will reduce secure habitat below the 1998 baseline set by the Grizzly Bear Conservation Strategy.

43.   Secure habitat will also be reduced in the Madison #1 Subunit, but will not

be reduced below the 1998 baseline level set by the Grizzly Bear
Conservation Strategy.

44.  During implementation, the Project will also increase the percentage of the
Bear Management subunits that have total motorized access route density
over 2 miles/square mile.

45.  In Madison #1 Subunit, the percentage of total motorized access route
density over 2 miles/square mile will increase from 7.5% to 9.6%.

46.  In Madison #2 Subunit, the percentage of total motorized access route
density over 2 miles/square mile will increase from 21.6% to 22.4%.

47.  The Project will cause disturbance (human presence, traffic, noise) that will
result in individual grizzly bears moving to adjacent areas with more secure
habitat and less disturbance.

48.  In particular, bears displaced by treatments in the Flats and on Horse Butte
would be forced to relocate further to avoid Project activities and find secure
habitat. The closest areas providing secure habitat include areas to the South
in the Madison Arm Flats, areas to the East in Yellowstone National Park,
and areas to the North beyond Whits Lakes.

49.  Horse Butte is an important spring feeding ground for grizzly bears in the
Hebgen Basin, so logging in the area during the spring months may displace
grizzlies from a reliable food source during an important time of the year.

50.   The reduction in forested cover from the Project is also likely to have an effect on individual grizzly bears in some portions of the Project area. Grizzly bears that have traditionally used Horse Butte and/or the area south of Rainbow Point Campground to take refuge between foraging attempts at the bison calving grounds may be displaced to areas on the peninsula further to the East, due to reductions in cover.

51.   This Project could also increase the risk of individual grizzly bear mortality during Project implementation due to a greater potential for human-bear conflicts resulting from increased human presence in the Project area.

52.   The Project will continue to have effects on grizzlies after Project implementation:  ongoing recreational use of decommissioned roads, especially by ungulate hunters, could have a longer-term effect on increased mortality risk for grizzly bears. This use would be non-motorized. Because ungulate hunting has been found to negatively affect grizzly bear survival, this longer-term increased access for hunters may result in more negative encounters with grizzly bears over time.

53.   The agencies agree that the Project is likely to adversely affect grizzly bears.

D.  PROJECT EFFECTS ON LYNX

54.   The lynx is a species listed as threatened under the ESA.

55.   The best available science on the habitat needs of lynx in the Northern

Rockies indicates that "[i]n contrast to [other] populations . . . lynx in the Rocky Mountains of Montana selected mature, multistoried forests composed of large diameter trees with high horizontal cover during winter."

56.  Moreover, "winter is the most constraining season for lynx in terms of resource use. . . . Thus, within heavily managed landscapes of the northern Rockies, [agency lynx research scientists] believe that managers should prioritize retention and recruitment of abundant and spatially well-distributed patches of mature, multi-layer spruce-fir forests."

57.  The best available science also states that mature forest is the most important forest component to protect for lynx reproduction and ultimately for lynx persistence.

58.  Thus, female lynx home ranges, should "contain greater than 50% mature forest" because that habitat protection would "provide a valuable conservation tool to ensure the persistence of threatened Canada lynx populations in the western US."

59.  Moreover, logging activities should "retain existing mature forest patches that provide year-round snowshoe hare habitat. . . ."

60.  FWS considers lynx to be present on the Hebgen Lake Ranger District of the Gallatin National Forest.

61.  The Environmental Assessment represents that the Project proposal includes

the logging of 1,582 acres of mapped lynx habitat.

62.     The Project authorizes 542 acres of logging that does not meet the requirements of the Northern Rockies Lynx Management Direction (Lynx Amendment) VEG S5 and S6 standards; thus, USFS exempted those acres from compliance under the wildland urban interface exception to the Lynx Amendment.

63.     The Project authorizes the logging of approximately 483 acres of mature, multi-storied mapped lynx habitat.

64.     The agencies agree that the Project is likely to adversely affect lynx.

E.  PROJECT EFFECTS ON ELK

65.     Elk are present across the analysis area although their distribution varies spatially and temporally.

66.     The Project occurs in the Buffalo Horn, Cabin Creek, and Henry's Mountains Elk Analysis Units.

67.     The Project Environmental Assessment states that the Buffalo Horn Elk Analysis Unit is 236,842 acres total, with 67,812 acres on National Forest lands.

68.     The Project Environmental Assessment states that there are 47,860 acres of existing spring, summer, and fall elk hiding cover within the Buffalo Horn Elk Analysis Unit.

69.    The Project Environmental Assessment states that there are 14,272 acres of

existing winter elk hiding cover within the Buffalo Horn Elk Analysis Unit.

70.    The Project Environmental Assessment states that the Cabin Creek Elk

Analysis Unit is 197,432 acres total, with 79,590 acres on National Forest

lands.

71.    The Project Environmental Assessment states that there are 17,296 acres of

existing spring, summer, and fall elk hiding cover within the Cabin Creek

Elk Analysis Unit.

72.    The Project Environmental Assessment states that there are 28,827 acres of

existing winter elk hiding cover within the Cabin Creek Elk Analysis Unit.

73.    The Project Environmental Assessment states that the Henry's Mountains

Elk Analysis Unit is 368,682 acres total, with 121,508 acres on National

Forest lands.

74.    The Project Environmental Assessment states that there are 70,696 acres of

spring, summer, and fall elk hiding cover within the Henry's Mountains Elk

Analysis Unit.

75.    The Project Environmental Assessment states that there are 21,739 acres of

winter elk hiding cover within the Henry's Mountains Elk Analysis Unit.

76.    According to the acreages set forth above, which are set forth by USFS in

the Environmental Assessment, the Elk Analysis Units contain hiding cover

at the following acreages:

Table 1:

| Elk Analysis Unit & Season | National Forest Lands Acreage | Elk Hiding Cover Acreage | Percentage of National Forest Lands with Elk Hiding Cover |
|---|---|---|---|
| Buffalo Horn – Spring, Summer, Fall | 67,812 acres | 47,860 acres | 71% |
| Buffalo Horn- Winter | 67,812 acres | 14,272 acres | 21% |
| Cabin Creek – Spring, Summer, Fall | 79,590 acres | 17,296 acres | 22% |
| Cabin Creek – Winter | 79,590 acres | 28,827 acres | 36% |
| Henry's Mountains – Spring, Summer, Fall | 121,508 acres | 70,696 acres | 58% |
| Henry's Mountains - Winter | 121,508 acres | 21,739 acres | 18% |

77.   The hiding cover percentages in Table 1 above do not match the hiding

cover percentages disclosed in the Environment Assessment for the

following reasons:

(a) In its hiding cover calculations in the Environmental Assessment for

National Forest Lands in the Buffalo Horn Elk Analysis Unit, USFS did not

use 67,812 acres as the denominator;

(b) In its hiding cover calculations in the Environmental Assessment for National Forest Lands in the Cabin Creek Elk Analysis Unit, USFS did not use 79,590 acres as the denominator; and

(c) In its hiding cover calculations in the Environmental Assessment for National Forest Lands in the Henry's Mountains Elk Analysis Unit, USFS did not use 121,508 acres as the denominator.

78.     In the Project Environmental Assessment, USFS represents that elk hiding cover exists at the following levels:

Table 2:

| Elk Analysis Unit & Season | USFS's Environmental Assessment Representation of Percentage of National Forest Lands with Elk Hiding Cover |
|---|---|
| Buffalo Horn – Spring, Summer, Fall | 74% |
| Buffalo Horn- Winter | 22% |
| Cabin Creek – Spring, Summer, Fall | 34% |
| Cabin Creek – Winter | 57% |
| Henry's Mountains – Spring, Summer, Fall | 74% |
| Henry's Mountains - Winter | 23% |

79.     In the Environmental Assessment, USFS does not disclose the numeric

        denominator (in acres) for the hiding cover percentages set forth above in

        Table 2.

80.     A comparison of elk hiding cover percentages using the Elk Analysis Unit

        (National Forest Lands) denominator as compared to the undisclosed

        denominator from the Environmental Assessment is set forth below:

Table 3:

| Elk Analysis Unit & Season | Actual Percentage of Elk Hiding Cover (National Forest Lands in Elk Analysis Unit as Denominator) | Environmental Assessment Representation of Percentage of Elk Hiding Cover (Undisclosed Denominator) |
|---|---|---|
| Buffalo Horn – Spring, Summer, Fall | 71% | 74% |
| Buffalo Horn- Winter | 21% | 22% |
| Cabin Creek – Spring, Summer, Fall | 22% | 34% |
| Cabin Creek – Winter | 36% | 57% |
| Henry's Mountains – Spring, Summer, Fall | 58% | 74% |
| Henry's Mountains - Winter | 18% | 23% |

81.  USFS represents that the Project will reduce hiding cover by the following

     percentages:

     •  1% reduction in spring, summer, and fall hiding cover in the Buffalo

        Horn Elk Analysis Unit,

     •  2% reduction in winter hiding cover in the Buffalo Horn Elk Analysis

        Unit,

     •  3% reduction in winter hiding cover in the Cabin Creek Elk Analysis

        Unit, and

     •  1% reduction in winter hiding cover in the Henry's Mountains Elk

        Analysis Unit.

82.  In the Project Environmental Assessment, USFS does not disclose the

     numerator or denominator used to calculate the percentages listed above in

     paragraph 81.

83.  Due to expected losses of hiding cover in this area from the Project, elk may

     reduce their use of Horse Butte. This would be most likely to occur during

     rifle hunting season.

84.  Prolonged loss of hiding cover on Fir Ridge may cause elk to alter their

     migration routes to avoid this area in the fall. Surrounding topography and

     vegetation may restrict their ability to alter their migration route in a

     substantial way which could increase elk vulnerability to hunting pressure in

the fall in this area.

F.  PROJECT EFFECTS ON WEEDS

85.    The weed infestation levels in Hebgen Basin are extensive.

86.    USFS determined:  "Even with mitigation and careful design it will be
       difficult to say the project will not lead to more weed spread.  The
       significance of the impact is subjective and as a result difficult to
       affirmatively state that there would be 'no significant impact.'"

87.    In USFS's "cumulative effects checklist" for invasive weeds for the Project,
       USFS sets forth three options:  (1)  "may have cumulative effects with the
       proposal," (2) may have insignificant cumulative effects with the proposal,"
       and (3) "will not have cumulative effects with the proposal."

88.    Thus, the first option - "may have cumulative effects with the proposal" – is
       referring to cumulative effects that are *not* "insignificant" because may have
       "insignificant" cumulative effects is the second option.

89.    In USFS's "cumulative effects checklist" for invasive weeds, USFS
       repeatedly finds that past and ongoing activities in the Project area "may
       have cumulative effects with the proposal" for the Project regarding invasive
       weeds.

90.    For example, most of the clearcuts on the Flats currently have yellow
       toadflax. Now that this weed species is present in the area it will continue to

spread into disturbed and undisturbed areas by people and wildlife.

91.    Another example is that road grading moves soil infected with weeds

(dormant seeds and root fragments) to new locations.

92.    Another example is that weeds beyond 20 feet from the highway often are

not treated. As a result, the harvest units next to the highway will likely

become infected with weeds.

93.    Another example is that most of the snowmobile trails have weed

infestations, and weeds may spread from the winter trails into the adjacent

treatment units.

G.  LONESOME WOOD 2 PROJECT

94.    The Lonesome Wood 2 Project is a logging project that is currently being

implemented on the Gallatin National Forest on the Hebgen Lake Ranger

District.

95.    The Lonesome Wood 2 Project is located on the west and south side of

Hebgen Lake, whereas the North Hebgen Project is located on the north and

east side of Hebgen Lake.

96.    The Lonesome Wood 2 Project includes 1,750 acres of commercial logging

to remove larger trees. There is no diameter limit for that logging, and the

logging includes 495 acres of old growth forest. The Project also allows an

additional 825 acres of potentially commercial logging to remove smaller

trees (six inches or less in diameter), and 325 acres of slashing and/or prescribed burning. The Project allows construction of six miles of new temporary logging roads and the reopening/reconstruction of 2.8 miles of formerly closed/restricted logging roads.  Full implementation of the Lonesome Wood 2 Project is expected to take 8-12 years.

97.    The "analysis areas" for the North Hebgen Project are the areas used for determining direct, indirect, and cumulative effects; USFS identifies and describes an analysis area for each resource and they vary from resource to resource.

98.    In the North Hebgen Project analysis, USFS uses the three affected "Elk Analysis Units" as the "analysis area" to assess impacts to elk.

99.    The North Hebgen Project occurs in the Buffalo Horn, Cabin Creek, and Henry's Mountains Elk Analysis Units

100.    The Lonesome Wood 2 Project occurs within the Henry's Mountains Elk Analysis Unit.

101.    The North Hebgen Project Environmental Assessment states "Implementation of Lonesome Wood 2 may overlap at least in part with implementation of this project. These effects would be distributed across the analysis area in space and time. Effects on elk across the analysis area due to these small losses in habitat effectiveness are expected to be minimal."

102.   The North Hebgen Project Environmental Assessment states:  "In addition to the 2,327 acres treated with Lonesome Wood 2 and the Rendezvous Trails projects, the cumulative effects of these treatments could, therefore, result in, at most, a total reduction of 2,369 acres of [spring, summer, and fall] hiding cover. . . ."

103.   A cumulative reduction of 2,369 acres of spring, summer, and fall hiding cover from three logging projects in the Henry's Mountains Elk Analysis Unit results in a reduction from 70,696 acres (existing) to 68,327 acres post-projects.

104.   68,327 acres of spring, summer, and fall hiding cover within 121,508 acres of National Forest lands within the Henry's Mountains Elk Analysis Unit results in a hiding cover percentage of 56%.

105.   Other than the reduction of hiding cover from Lonesome Wood 2, the North Hebgen Project Environmental Assessment does not disclose any other quantitative details or details of potential cumulative effects of the Lonesome Wood 2 Project.

106.   In the North Hebgen Project analysis, USFS uses the mountain range to assess impacts to old growth forest.

107.   The North Hebgen Project occurs in the Madison and Henry's Mountain ranges.

108.   Within the Madison Mountain Range, the North Hebgen Project will allow the logging of approximately 900 acres of old growth forest.

109.   The Lonesome Wood 2 Project EIS states:  "The Lonesome Wood Vegetation Management 2 project area is located in the southern part of the Madison Range west of Hebgen Reservoir."

110.   The Lonesome Wood 2 Record of Decision authorizes the logging of approximately 495 acres of designated old growth forest.

111.   The North Hebgen Project Environmental Assessment fails to disclose detailed and quantified information that assesses the cumulative effects of the Project and the Lonesome Wood 2 Project on old growth.  Instead, it states: "Within the Madison Mountain range there are no currently or reasonably foreseeable vegetation management projects that would affect old growth on Custer Gallatin National Forest Lands."

112.   In the North Hebgen Project analysis, USFS uses the "Bear Management Unit" to assess impacts to grizzly bears.

113.   The Lonesome Wood 2 Project occurs in the Henry's Lake #2 Bear Management Subunit, which is directly adjacent to the Madison #1 and #2 Bear Management Subunits, in which the North Hebgen Project occurs.

114.   The map below shows the location of both the Henry's Lake #2 Subunit, and the Madison #1 and #2 Subunits:



**Figure A2.** *Bear Management Units (BMUs) and subunits comprising the Grizzly Bear Recovery Zone in the Yellowstone Ecosystem.*

115. Although the Lonesome Wood 2 Project and the North Hebgen Project occur in directly adjacent Bear Management Subunits, the North Hebgen Environmental Assessment does not disclose or analyze the cumulative effects on grizzly bears from the two simultaneous, adjacent 8-12 year-long Projects.

116. In the North Hebgen Project analysis, USFS uses the "Lynx Analysis Unit" to assess impacts to lynx.

117. The North Hebgen Project occurs within the Upper Madison Lynx Analysis Unit and allows the logging of 483 acres of multistoried, mature forest that is mapped lynx habitat.

118.   The Lonesome Wood 2 Project occurs within the Henry's Lake Mountains Lynx Analysis Unit and allows the logging of 1,548 acres of multistoried, mature forest that is mapped lynx habitat.

119.   The Upper Madison Lynx Analysis Unit (North Hebgen) is directly adjacent to the Henry's Lake Mountains Lynx Analysis Unit (Lonesome Wood 2) as demonstrated by the maps below:

Figure 30.  Henry's Lake Mountains Lynx Analysis Units (LAU)





120.   Although the Lonesome Wood 2 Project and the North Hebgen Project occur in directly adjacent Lynx Analysis Units, the North Hebgen Environmental Assessment does not disclose or analyze the cumulative effects on lynx from the two simultaneous, adjacent 8-12 year-long Projects.

H.  WILDFIRE

121.   Published, peer-reviewed literature does not support the premise that commercial logging will reduce fire risk in wet, high-elevation forests such as those affected by this Project.  For example, Schoennagel et al (2004) states: "we are concerned that the model of historical fire effects and 20th-century fire suppression in dry ponderosa pine forests is being applied uncritically across all Rocky Mountain forests, including where it is inappropriate []."

122.   Schoennagel et al (2004) states: "Mechanical fuel reduction in subalpine forests would not represent a restoration treatment but rather a departure from the natural range of variability in stand structure."

123.   Schoennagel et al (2004) states: "Given the behavior of fire in Yellowstone in 1988, fuel reduction projects probably will not substantially reduce the frequency, size, or severity of wildfires under extreme weather conditions."

124.   Schoennagel et al (2004) (emphasis added) states: "The Yellowstone fires in 1988 revealed that variation in fuel conditions, as measured by stand age and density, had only minimal influence on fire behavior. Therefore, *we expect fuel-reduction treatments in high-elevation forests to be generally unsuccessful in reducing fire frequency, severity, and size*, given the overriding importance of extreme climate in controlling fire regimes in this

zone. Thinning also will not restore subalpine forests, because they were dense historically and have not changed significantly in response to fire suppression. Thus, *fuel-reduction efforts in most Rocky Mountain subalpine forests probably would not effectively mitigate the fire hazard*, and these efforts may create new ecological problems by moving the forest structure outside the historic range of variability."

125.   Likewise, Brown et al (2004) (emphasis added) states:  "At higher elevations, forests of subalpine fir, Engelmann spruce[], mountain hemlock [], and lodgepole or whitebark pine [] predominate. These forests also have long fire return intervals and contain a high proportion of fire sensitive trees []. At periods averaging a few hundred years, extreme drought conditions would prime these forests for large, severe fires that would tend to set the forest back to an early successional stage, with a large carry-over of dead trees as a legacy of snags and logs in the regenerating forest....natural ecological dynamics are largely preserved because fire suppression has been effective for less than one natural fire cycle. Thinning for restoration does not appear to be appropriate in these forests []. *Efforts to manipulate stand structures to reduce fire hazard will not only be of limited effectiveness* [] but may also move systems away from pre-1850 conditions to the detriment of wildlife and watersheds."

126. According to Graham et al (2004), thinning may increase the likelihood of wildfire ignition in the type of forests in this Project area: "The probability of ignition is strongly related to fine fuel moisture content, air temperature, the amount of shading of surface fuels, and the occurrence of an ignition source (human or lightning caused) []. Stand structure strongly influences all these factors. There is generally a warmer, dryer microclimate in more open stands (fig. 9) compared to denser stands []. Dense stands (canopy cover) tend to provide more shading of fuels, keeping relative humidity higher and air and fuel temperature lower than in more open stands. Thus, dense stands tend to maintain higher surface fuel moisture contents compared to more open stands []. More open stands also tend to allow higher wind speeds that tend to dry fuels compared to dense stands []. These factors may increase probability of ignition in some open canopy stands compared to dense canopy stands."

127. USFS's own research scientist, Dr. Jack Cohen, states: "It may not be necessary or effective to treat fuels in adjacent areas in order to suppress fires before they reach homes; rather, it is the treatment of the fuels immediately proximate to the residences, and the degree to which the residential structures themselves can ignite that determine if the residences

are vulnerable."

I.  AMENDMENT 51

128.  Amendment 51 to the Gallatin Forest Plan removed or modified 56 goals and standards from the Gallatin Forest Plan.

129.  Amendment 51 removed Forest-wide Goal 7, which stated: "Provide habitat for viable populations of all indigenous wildlife species and for increasing populations of big game animals."

130.  Amendment 51 removed the requirement in Forest-wide Standard 6 (a)(5) to map "moist areas (wallows etc.); foraging areas (meadows and parks); critical hiding cover (see Glossary in Chapter VI for definition); thermal cover; migration routes, and staging areas" for each Project.

131.  Amendment 51 modified the 2/3 hiding cover requirement in Forest-wide Standard 6(a)(5), in several ways:  (1) by setting the requirement to analyze hiding cover at the Elk Analysis Unit scale, (2) by limiting the requirement for hiding cover so that it now only applies to "Douglas-fir, lodgepole pine, and subalpine fir conifer forest types," (3) by limiting the requirement for hiding cover so that it now only applies to National Forest lands, (4) by changing the definition of hiding cover to require only 40% canopy cover, and (5) by setting the 2/3 requirement "to function as hiding cover for elk at any point in time."

132.   Amendment 51 eliminates the Appendix G, Timber and Fire Management
       Standard 4(A)(3) requirement that no point in clearcuts may be more than
       600 feet from cover.

133.   Amendment 51 modified Forest-wide Standard 6(c)(2) in several ways:  (1)
       by eliminating the requirement that old growth be assessed at the smaller
       "Timber Compartment" level, and now requiring that old growth be assessed
       at the larger "mountain range" scale; (2) by eliminating the requirement that
       old growth be assessed as a percentage of the entire area, and now requiring
       that old growth only be assessed as a percentage of the forested area within
       the entire area; and (3) by removing the requirement to maintain at least 10%
       mature forest in additional to 10% old growth forest.

134.   Amendment 51 changed Forest-wide Standard 8(j) because the "existing
       Forest Plan standard [was] not consistent with the direction in the Northern
       Rockies Lynx Management Direction FEIS [] regarding thinning in
       snowshoe hare habitat."

135.   Amendment 51 eliminated the Timber Standard for Management Area 13,
       which stated:  "No commercial thinning is planned."

136.   Amendment 51 eliminated the Management Area 13 standard that required
       at least 30% of each timber compartment to be maintained as old growth,

and replaced it with a standard that requires that only 30% of the forest acres

within a timber compartment must be maintained as "over-mature" forest,

which has a less restrictive definition than Green et al "old growth."

137.   USFS concedes that Amendment 51 has "a potential effect on wildlife

associated with old growth . . . ."

138.   USFS states that Amendment 51 may "possibly [have] some beneficial

effect to [threatened/endangered species] wildlife (not considering grizzly

bear here) at the project level by having clear up-to-date Forest Plan

guidance."

## VII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

The Project violates the Forest Plan hiding cover standard and/or the Forest Plan

hiding cover standard is arbitrary and capricious.

139.   All previous paragraphs are incorporated by reference.

140.   The Forest Plan hiding cover standard states:  "Vegetation treatment projects

(e.g. timber harvest, thinning and prescribed burning) shall maintain at least

two-thirds (2/3) of Douglas fir, lodgepole pine, and subalpine fir conifer

forest cover types (on National Forest System lands) with at least 40%

canopy cover (on National Forest System lands), to function as hiding cover

for elk at any point in time. Hiding cover will be assessed for an elk analysis

unit (EAU) which is based on a collaborative mapping effort between the local state (MDFWP) wildlife biologist and the local Forest Service wildlife biologist."

141. Contrary to this standard, in the Project Environmental Assessment, USFS did not use National Forest lands within the Elk Analysis Unit as the denominator for its hiding cover calculations.  Instead it used an undisclosed denominator.  This failure violates the Forest Plan and thereby violates NFMA.   The failure to clearly disclose the denominator for its hiding cover calculations, and indicate why USFS believes that denominator is an accurate and representative sample size, also violates NEPA.

142. If USFS had used National Forest lands within the Elk Analysis Unit as the denominator for its hiding cover calculations, the Project would violate the 2/3 standard in at least one Elk Analysis Unit:  Cabin Creek Elk Analysis Unit currently has only 22% elk hiding cover in spring, summer, and fall, and 36% elk hiding cover in winter.  Even if these percentages could be added together, it would still amount to only 58% hiding cover, and the Project will further reduce hiding cover in that Elk Analysis Unit despite already failing the 2/3 requirement. This action violates the Forest Plan and thereby violates NFMA.

143. Furthermore, the new Forest Plan standard for hiding cover requires 2/3

"hiding cover for elk at any point in time."  In the point of time that is

spring, summer, or fall, the Cabin Creek Elk Analysis Unit has only 22%

hiding cover and the Henry's Mountains Elk Analysis Unit has only 58% elk

hiding cover.  Additionally, in the point of time that is winter, all three Elk

Analysis Units have less than 2/3 hiding cover (Buffalo Horn – 21%, Cabin

Creek – 36%, and Henry's Mountains – 18%).  The failure to maintain 2/3

hiding cover for elk "at any point in time" and the Project allowance for

logging that further reduces these percentages violates the Forest Plan and

violates NFMA.  In the very least, USFS's failure to discuss the "at any

point in time" requirement and explain why it does not require 2/3 hiding

cover in each season, violates NEPA.

144.   Finally, USFS states or implies that the reason it did not use the National

Forest lands in the Elk Analysis Unit as the denominator for the elk hiding

cover calculations is that it does not have data for all of the National Forest

lands within the Elk Analysis Units.  If this is true, then the new Forest Plan

hiding cover standard is arbitrary and capricious because it requires the use

of a denominator that is impossible for USFS to use in practice at the project

level.

145.   For the above-stated reasons, USFS is violating NEPA, NFMA, and the

APA.

## SECOND CLAIM FOR RELIEF

USFS's failure to prepare a full EIS for the Project violates NEPA and the APA.

146. All previous paragraphs are incorporated by reference.

147. To prevail on the claim that a federal agency was required to prepare an EIS under NEPA, the plaintiffs need not demonstrate that significant effects *will* occur. A showing that there are "*substantial questions* whether a project may have a significant effect on the environment" is sufficient to trigger this requirement.

148. To determine whether there may be a significant impact, the following factors must be considered: (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial; (2) The degree to which the proposed action affects public health or safety; (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial; (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; (6) The degree to which the action may establish a precedent for future actions with significant effects or represents

a decision in principle about a future consideration; (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts; (8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973, and (10) Whether the action threatens a violation of Federal, State, or local law.

149.  "[I]n the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant."

150. "Significance cannot be avoided by terming an terming an action temporary or by breaking it down into small component parts."

151.  "A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial."

152. There are substantial questions regarding whether the Project may have significant impacts for the following reasons:  (1) the Project will cause adverse effects to grizzly bears and requires an exemption from the Grizzly

Bear Conservation Strategy protections in an area that already has some of the most degraded habitat in the Recovery Zone; (2) the Project will cause adverse effects to lynx, a threatened species listed under the ESA, and requires exemptions from the protective standards of the Lynx Amendment; (3) there are significant cumulative effects posed by the Project and the directly adjacent 8-12 year long Lonesome Wood 2 logging project; (4) the Project allows the logging of hundreds of acres of old growth forest; (5) the underlying premise of the Project that commercial logging in high-elevation, wet forests will reduce fire severity is highly controversial and not supported by peer-reviewed scientific literature; (6) the Project violates the Gallatin Forest Plan standard that limits instream sediment in Class A trout streams, and therefore required an exemption from that standard; (7) the Project, in addition to past and ongoing activities, may have cumulative effects on the spread of invasive weeds in the Project area.

153. For the above-stated reasons, there are substantial questions regarding whether the Project may have significant effects; therefore, USFS's failure to prepare a full EIS for the Project violates NEPA and the APA.

THIRD CLAIM FOR RELIEF

The Environmental Assessment for the Project does not take a hard look at the potential cumulative effects of the North Hebgen Project.

154.   All previous paragraphs are incorporated by reference.

155.   In a NEPA analysis, USFS must address the cumulative effects of its

proposed action.

156.   The regulations define "cumulative impact" as "the impact on the

environment which results from the incremental impact of the action when

added to other past, present, and reasonably foreseeable future actions

regardless of what agency (Federal or non-Federal) or person undertakes

such other actions. Cumulative impacts can result from individually minor

but collectively significant actions taking place over a period of time."

157.   A cumulative effects analysis must have at least some detailed or quantified

information to pass legal muster, and the analysis must be more than

perfunctory; it must provide a useful analysis of the cumulative impacts of

past, present, and future projects.

158.   Providing no quantified assessment of the combined environmental impacts

of reasonably foreseeable logging projects violates this basic NEPA

requirement.

159.   As noted above, the Lonesome Wood 2 Project is a logging project that is

currently being implemented on the Gallatin National Forest on the Hebgen

Lake Ranger District; it is directly adjacent to the North Hebgen Project.

160.   Although both Projects occur in the Madison Mountain Range, the North

Hebgen Environmental Assessment falsely states: "Within the Madison Mountain range there are no currently or reasonably foreseeable vegetation management projects that would affect old growth on Custer Gallatin National Forest Lands." Thus, USFS fails to disclose and analyze the cumulative effects from the logging of hundreds of acres of old growth forest between the two Projects.

161. Although both Projects occur in directly adjacent Lynx Analysis Units, USFS fails to disclose and analyze the cumulative effects from the logging of hundreds of acres of mapped lynx habitat between the two Projects.

162. Although both Projects occur in directly adjacent Bear Management Subunits, USFS fails to disclose and analyze the cumulative effects from the logging of hundreds of acres of forest cover and the construction of over 20 miles of temporary logging roads between the two Projects.

163. USFS does disclose the fact that both Projects occur within the Henry's Mountains Elk Analysis Unit.

164. The North Hebgen Project Environmental Assessment states: "Implementation of Lonesome Wood 2 may overlap at least in part with implementation of this project. These effects would be distributed across the analysis area in space and time. Effects on elk across the analysis area due to these small losses in habitat effectiveness are expected to be minimal."

165.  The North Hebgen Project Environmental Assessment further states: "In addition to the 2,327 acres treated with Lonesome Wood 2 and the Rendezvous Trails projects, the cumulative effects of these treatments could, therefore, result in, at most, a total reduction of 2,369 acres of [spring, summer, and fall] hiding cover. . . ."

166.  Other than the reduction of hiding cover from Lonesome Wood 2, the North Hebgen Project Environmental Assessment does not disclose any other quantitative details or details of potential cumulative effects of the Lonesome Wood 2 Project in the elk analysis.

167.  USFS's failure to take a hard look and fully and fairly disclose quantified and detailed information about the cumulative effects of the North Hebgen and Lonesome Wood 2 Projects violates NEPA and the APA.

FOURTH CLAIM FOR RELIEF

The agencies' failure to consult on lynx and lynx critical habitat for Gallatin Forest Plan Amendment 51 violates the ESA and APA.

168.  All previous paragraphs are incorporated by reference.

169.  The Ninth Circuit holds that actions that have any chance of affecting listed species or critical habitat – even if it is later determined that the actions are not likely to do so – require at least some consultation under the ESA.

170.  "May affect" is a low threshold and any possible effect, whether beneficial,

benign, adverse or of an undetermined character, triggers the requirement.

171.   While the disturbance effects may be discountable or insignificant, any
       possible effect requires USFS to obtain the concurrence of FWS in order to
       avoid formal Section 7 consultation.

172.   As discussed above, Amendment 51 to the Gallatin Forest Plan eliminated or
       modified 56 goals and standards in the Forest Plan.

173.   The on-the-ground repercussions of Amendment 51 will include less old
       growth forest, less hiding cover, and larger clearcuts.

174.   All three of these effects will degrade habitat for lynx, which is a species
       that requires large areas of dense, mature forest.

175.   As USFS itself states in the Amendment 51 NEPA analysis:  Amendment 51
       has "a potential effect on wildlife associated with old growth . . . ."

176.   USFS also states in the Amendment 51 NEPA analysis that Amendment 51
       may "possibly [have] some beneficial effect to [threatened/endangered
       species] wildlife (not considering grizzly bear here) at the project level by
       having clear up-to-date Forest Plan guidance."

177.   Despite the possible and potential effects on lynx, the agencies did not
       conduct ESA consultation for lynx for Amendment 51.

178.   The agencies' refusal to conduct ESA consultation for lynx for Amendment
       51, and USFS's conclusion that Amendment 51 would have "no effect" on

lynx, are arbitrary and capricious and violate the ESA and APA.

## VIII. RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A. Declare that the Project and/or Amendment 51 violates the law;

B. Enjoin implementation of the Project;

C. Award Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees under the ESA and/or under EAJA; and

D. Grant Plaintiffs any such further relief as may be just, proper, and equitable.


Respectfully submitted this 11th Day of May, 2018.


*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Kristine Akland
AKLAND LAW FIRM, PLLC

Attorneys for Plaintiffs