Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Kristine Akland
AKLAND LAW FIRM, PLLC
PO Box 7274
Missoula, MT 59807
(406) 544-9863
aklandlawfirm@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES, <br>     Plaintiffs, <br><br> vs. <br><br> LEANNE MARTEN, Regional Forester, USFS Region One, U.S. FOREST SERVICE, and U.S. FISH & WILDLIFE SERVICE, <br>     Defendants | CV-18-87-M-DLC <br><br> FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

## I.  INTRODUCTION

1.  This is a civil action for judicial review under the citizen suit provision of the Endangered Species Act and the Administrative Procedure Act of the U.S. Forest Service's (USFS) and U.S. Fish and Wildlife Service's (FWS) authorizations of the North Hebgen Project (Project) on the Gallatin portion of the Custer-Gallatin National Forest (Forest), and Amendment 51 to the Gallatin National Forest Land and Resource Management Plan (Forest Plan).

2.  Plaintiffs Alliance for the Wild Rockies and Native Ecosystems Council attest that the decisions approving the Project and Amendment 51 are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.  Defendants' approval of the Project and Amendment 51 and corresponding documents or lack thereof as written violate the National Environmental Policy Act (NEPA), 42 U.S.C. §4331 et seq., the National Forest Management Act (NFMA), 16 U.S.C. §1600 et seq., the Endangered Species Act (ESA), 16 U.S.C. §1531 et seq, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq.

4.  Plaintiffs request that the Court set aside and remand the Project decision and Amendment 51 pursuant to 5 U.S.C. §706(2)(A) and 16 U.S.C. §1540(g), and that the Court enjoin implementation of the Project.

5.    Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs, and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412, and the ESA, 16 U.S.C. §1540(g)(4), and such other relief as this Court deems just and proper.

## II. JURISDICTION

6.    This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

7.    An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Gallatin National Forest for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

8.    The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, ESA, and the APA. The requested relief would

redress these injuries and this Court has the authority to grant Plaintiffs'
requested relief under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 &
706.

9.   Plaintiffs sent a notice of intent to sue under the ESA regarding their
challenge to Amendment 51 to USFS, FWS, the Department of the Interior,
the Department of Agriculture, and the Department of Justice on July 14,
2017.  Thus, Plaintiffs have complied with the 60-day notice requirement for
their ESA challenge to Amendment 51 and this Court has jurisdiction to
review this claim.  Plaintiffs also sent a notice of intent to sue under the ESA
regarding their challenge to the Project to USFS, FWS, the Department of
Interior, the Department of Agriculture, and the Department of Justice on
May 4, 2018. Thus, Plaintiffs have complied with the 60-day notice
requirement for their ESA challenge to the Project and this Court has
jurisdiction to review this claim.

10.   Plaintiffs submitted timely written comments concerning the Project and
Amendment 51 and fully participated in the available administrative review
processes; thus they have exhausted administrative remedies. Thus, the
Court has jurisdiction to review Plaintiffs' APA claims.

### III. VENUE

11.   Venue in this case is proper under 28 U.S.C. §1391(e) and Local Rule

3.3(a)(1). Defendant Marten, the chief representative for USFS Region One, and the chief representative of the USFS in Montana, resides within the Missoula Division of the United States District Court for the District of Montana.

## IV. PARTIES

12.    Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Gallatin National Forest. Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems by approving the challenged Project and Amendment 51.  Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

13.    Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana

corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of natural resources on public lands in the Northern Rockies. Its members use and will continue to use the Gallatin National Forest for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. USFS's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Gallatin National Forest, including the Project area. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

14.   Defendant LEANNE MARTEN is the Regional Forester for the Northern Region/Region One of the USFS, and in that capacity is charged with ultimate responsibility for ensuring that decisions made at each National Forest in the Northern Region, including the Custer-Gallatin National Forest, are consistent with applicable laws, regulations, and official policies and procedures.

15.   Defendant UNITED STATES FOREST SERVICE (USFS) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Custer-Gallatin National Forest.

16.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE (FWS) is
       an administrative agency within the U.S. Department of Interior and is
       responsible for lawful management of species listed under the Endangered
       Species Act.

## V. PROCEDURAL BACKGROUND

17.    USFS signed the Decision Notice authorizing the Project on June 29, 2017.

18.    USFS sent a Biological Assessment for the Project to FWS on December 16,
       2016, and received a Biological Opinion for the Project on May 17, 2017.

19.    USFS signed the Decision Notice for Amendment 51 on November 2, 2015.

20.    USFS produced a Biological Assessment for Amendment 51 on April 28,
       2015, and received a Biological Opinion from FWS for Amendment 51 on
       October 2, 2015.

## VI. FACTUAL ALLEGATIONS

A.  PROJECT AREA

21.    The Project area is in the Greater Yellowstone Area and abuts Yellowstone
       National Park.

22.    The Project area is located in the Tepee Creek drainage south of the Cabin
       Creek Wildlife Management Area to the Madison Arm of Hebgen Lake, and
       from the Yellowstone National Park Boundary west to the Horse Butte
       peninsula and the vicinity of Red Canyon on the North side of Hebgen Lake.

23.   Project units are proposed in portions of sections 24-26, 35, 36, T 11 S, R 04

E; sections 17, 19, 20, 29-34, T 11 S , R 05 E; sections 2, 11, 13, 15, 22-27,

35, 36, T 12 S, R 04 E; Sections 3-6, 8-10, 19-22, 27-34, T 12 S, R 05 E and

Sections 3, 4 , 10, T 13 S, R 05 E.

24.   The Project area also includes portions of the Madison 1-549 Inventoried

Roadless Area.

25.   The Project area, which is defined by the outer boundaries of all units, is on

the Hebgen Lake District of the Custer-Gallatin National Forest and is

approximately 73,250 acres.

26.   Elevation in the Project area ranges from approximately 6,400 feet to over

10,300 feet. The analysis area is about 74% forested.  Subalpine fir mix and

the lodgepole pine mix forest dominance types dominate the analysis area.

27.   The Project occurs within the Yellowstone Grizzly Bear Recovery Zone

(also referred to as the Primary Conservation Area) within the Madison Bear

Management Unit, including within subunits Madison #1 and Madison #2.

28.   The Project also occurs within the Upper Madison Lynx Analysis Unit.

29.   The Project also occurs within the Buffalo Horn, Cabin Creek, and Henry's

Mountains Elk Analysis Units.

30.   The Project also occurs within the Madison and Henry's mountain ranges.

B.  PROJECT

31.    The Forest Supervisor selected Environmental Assessment Alternative 2
       with modifications for the Project.

32.    The Project includes up to 5,670 acres of commercial and non-commercial
       logging:  3,306 acres of commercial logging, 127 acres of powerline
       thinning, 177 acres of post and pole thinning, 137 acres of hand thinning,
       1,076 acres of precommercial thinning, and 843 acres of thinning around
       Whitebark pine.

33.    The Environmental Assessment estimates that the Project allows the logging
       of up to 908 acres of actual and potential old growth forest in the Project
       area, all within the Madison Mountain Range.

34.    The Project also includes 15.6 miles of new, temporary road construction.

35.    The Project will also use 43.6 miles of existing roads, although the
       Environmental Assessment does not specify how many miles of road are
       closed roads that will be reopened.

36.    There is extensive past logging in the Little Teepee drainage.  The Project
       includes a site-specific Forest Plan amendment to exempt the Project from
       complying with Forest Plan Amendment #45 (Travel Plan) Standard E-4 in
       Little Teepee Creek and Red Canyon Creek.  The standard for Class A
       streams, which include native cutthroat streams, limits instream fine

sediment to 26% maximum: Little Teepee Creek currently has 34.1%
instream fine sediment and the Project will increase it to 38.7%; Red Canyon
currently has 28.5% instream fine sediment and the Project will increase it to
29.0%.

37. During the Project, USFS says it will barricade or gate or "sign" temporary
Project roads "as needed" to prevent public use of roads opened to logging
contractors and administrators.

38. USFS estimates that it will take 8-12 years to fully implement the Project.

C.  PROJECT EFFECTS ON GRIZZLY BEARS

39. The Interagency Grizzly Bear Study Team has established that the Project
area is located within the home range of a substantial number of grizzly
bears.

40. Interagency Grizzly Bear Study Team has documented 31 GPS locations
(between 2005-2012) from 7 individual grizzly bears (2 females, 5 males)
recorded inside the proposed Project timber harvest units. The seven
individual grizzly bears were 1 female with a yearling, 1 subadult female, 1
subadult male, and 4 adult males.

41. During implementation, the Project will reduce secure habitat for grizzly
bears within the Madison Bear Management Unit.

42. In Madison # 2 Subunit, which was previously identified by the agencies as

a Subunit in need of improvement due to its already degraded baseline condition for secure habitat, the Project will reduce secure habitat below the 1998 baseline set by the Grizzly Bear Conservation Strategy.

43. Secure habitat will also be reduced in the Madison #1 Subunit, but will not be reduced below the 1998 baseline level set by the Grizzly Bear Conservation Strategy.

44. During implementation, the Project will also increase the percentage of the Bear Management subunits that have total motorized access route density over 2 miles/square mile.

45. In Madison #1 Subunit, the percentage of total motorized access route density over 2 miles/square mile will increase from 7.5% to 9.6%.

46. In Madison #2 Subunit, the percentage of total motorized access route density over 2 miles/square mile will increase from 21.6% to 22.4%.

47. The Project will cause disturbance (human presence, traffic, noise) that will result in individual grizzly bears moving to adjacent areas with more secure habitat and less disturbance.

48. In particular, bears displaced by treatments in the Flats and on Horse Butte would be forced to relocate further to avoid Project activities and find secure habitat. The closest areas providing secure habitat include areas to the South in the Madison Arm Flats, areas to the East in Yellowstone National Park,

and areas to the North beyond Whits Lakes.

49.   Horse Butte is an important spring feeding ground for grizzly bears in the

Hebgen Basin, so logging in the area during the spring months may displace

grizzlies from a reliable food source during an important time of the year.

50.   The reduction in forested cover from the Project is also likely to have an

effect on individual grizzly bears in some portions of the Project area.

Grizzly bears that have traditionally used Horse Butte and/or the area south

of Rainbow Point Campground to take refuge between foraging attempts at

the bison calving grounds may be displaced to areas on the peninsula further

to the East, due to reductions in cover.

51.   This Project could also increase the risk of individual grizzly bear mortality

during Project implementation due to a greater potential for human-bear

conflicts resulting from increased human presence in the Project area.

52.   The Project will continue to have effects on grizzlies after Project

implementation:  ongoing recreational use of decommissioned roads,

especially by ungulate hunters, could have a longer-term effect on increased

mortality risk for grizzly bears. This use would be non-motorized. Because

ungulate hunting has been found to negatively affect grizzly bear survival,

this longer-term increased access for hunters may result in more negative

encounters with grizzly bears over time.

53.   The agencies agree that the Project is likely to adversely affect grizzly bears.

D.  PROJECT EFFECTS ON LYNX

54.   The lynx is a species listed as threatened under the ESA.

55.   Squires et al (2010), "Seasonal Resource Selection of Canada Lynx in

Managed Forests of the Northern Rocky Mountains," finds: that "[i]n

contrast to [other] populations . . . lynx in the Rocky Mountains of Montana

selected mature, multistoried forests composed of large diameter trees with

high horizontal cover during winter."

56.   Squires et al (2010), "Seasonal Resource Selection of Canada Lynx in

Managed Forests of the Northern Rocky Mountains," finds: "winter is the

most constraining season for lynx in terms of resource use. . . . Thus, within

heavily managed landscapes of the northern Rockies, [agency lynx research

scientists] believe that managers should prioritize retention and recruitment

of abundant and spatially well-distributed patches of mature, multi-layer

spruce-fir forests."

57.   Kosterman 2014, "Correlates of Canada Lynx Reproductive Success in

Northwestern Montana," finds that mature forest is the most important forest

component to protect for lynx reproduction and ultimately for lynx

persistence.

58.   Kosterman 2014, "Correlates of Canada Lynx Reproductive Success in

Northwestern Montana," finds that female lynx home ranges, should "contain greater than 50% mature forest" because that habitat protection would "provide a valuable conservation tool to ensure the persistence of threatened Canada lynx populations in the western US."

59.   Kosterman 2014, "Correlates of Canada Lynx Reproductive Success in Northwestern Montana," finds that logging activities should "retain existing mature forest patches that provide year-round snowshoe hare habitat. . . ."

60.   FWS considers lynx to be present on the Hebgen Lake Ranger District of the Gallatin National Forest.

61.   The Environmental Assessment represents that the Project proposal includes the logging of 1,582 acres of mapped lynx habitat.

62.   The Project authorizes 542 acres of logging that does not meet the requirements of the Northern Rockies Lynx Management Direction (Lynx Amendment) VEG S5 and S6 standards; thus, USFS exempted those acres from compliance under the wildland urban interface exception to the Lynx Amendment.

63.   The Project authorizes the logging of approximately 483 acres of mature, multi-storied mapped lynx habitat.

64.   The agencies agree that the Project is likely to adversely affect lynx.

E.  PROJECT EFFECTS ON ELK

65.   Elk are present across the analysis area although their distribution varies

spatially and temporally.

66.   The Project occurs in the Buffalo Horn, Cabin Creek, and Henry's

Mountains Elk Analysis Units.

67.   The Project Environmental Assessment states that the Buffalo Horn Elk

Analysis Unit is 236,842 acres total, with 67,812 acres on National Forest

lands.

68.   The Project Environmental Assessment states that there are 47,860 acres of

existing spring, summer, and fall elk hiding cover within the Buffalo Horn

Elk Analysis Unit.

69.   The Project Environmental Assessment states that there are 14,272 acres of

existing winter elk hiding cover within the Buffalo Horn Elk Analysis Unit.

70.   The Project Environmental Assessment states that the Cabin Creek Elk

Analysis Unit is 197,432 acres total, with 79,590 acres on National Forest

lands.

71.   The Project Environmental Assessment states that there are 17,296 acres of

existing spring, summer, and fall elk hiding cover within the Cabin Creek

Elk Analysis Unit.

72.   The Project Environmental Assessment states that there are 28,827 acres of

existing winter elk hiding cover within the Cabin Creek Elk Analysis Unit.

73.     The Project Environmental Assessment states that the Henry's Mountains Elk Analysis Unit is 368,682 acres total, with 121,508 acres on National Forest lands.

74.     The Project Environmental Assessment states that there are 70,696 acres of spring, summer, and fall elk hiding cover within the Henry's Mountains Elk Analysis Unit.

75.     The Project Environmental Assessment states that there are 21,739 acres of winter elk hiding cover within the Henry's Mountains Elk Analysis Unit.

76.     According to the acreages set forth above, which are set forth by USFS in the Environmental Assessment, the Elk Analysis Units contain hiding cover at the following acreages:

Table 1:

| Elk Analysis Unit & Season | National Forest Lands Acreage | Elk Hiding Cover Acreage | Percentage of National Forest Lands with Elk Hiding Cover |
|---|---|---|---|
| Buffalo Horn – Spring, Summer, Fall | 67,812 acres | 47,860 acres | 71% |
| Buffalo Horn- Winter | 67,812 acres | 14,272 acres | 21% |
| Cabin Creek – Spring, Summer, Fall | 79,590 acres | 17,296 acres | 22% |
| Cabin Creek – Winter | 79,590 acres | 28,827 acres | 36% |

| Henry's Mountains – Spring, Summer, Fall | 121,508 acres | 70,696 acres | 58% |
|---|---|---|---|
| Henry's Mountains - Winter | 121,508 acres | 21,739 acres | 18% |

77. The hiding cover percentages in Table 1 above do not match the hiding cover percentages disclosed in the Environment Assessment for the following reasons:

(a) In its hiding cover calculations in the Environmental Assessment for National Forest Lands in the Buffalo Horn Elk Analysis Unit, USFS did not use 67,812 acres as the denominator;

(b) In its hiding cover calculations in the Environmental Assessment for National Forest Lands in the Cabin Creek Elk Analysis Unit, USFS did not use 79,590 acres as the denominator; and

(c) In its hiding cover calculations in the Environmental Assessment for National Forest Lands in the Henry's Mountains Elk Analysis Unit, USFS did not use 121,508 acres as the denominator.

//

//

//

//

78.   In the Project Environmental Assessment, USFS represents that elk hiding

cover exists at the following levels:

Table 2:

| Elk Analysis Unit & Season | USFS's Environmental Assessment Representation of Percentage of National Forest Lands with Elk Hiding Cover |
|---|---|
| Buffalo Horn – Spring, Summer, Fall | 74% |
| Buffalo Horn- Winter | 22% |
| Cabin Creek – Spring, Summer, Fall | 34% |
| Cabin Creek – Winter | 57% |
| Henry's Mountains – Spring, Summer, Fall | 74% |
| Henry's Mountains - Winter | 23% |

79.   In the Environmental Assessment, USFS does not disclose the numeric

denominator (in acres) for the hiding cover percentages set forth above in

Table 2.

80.   A comparison of elk hiding cover percentages using the Elk Analysis Unit

(National Forest Lands) denominator as compared to the undisclosed

denominator from the Environmental Assessment is set forth below:

Table 3:

| Elk Analysis Unit & Season | Actual Percentage of Elk Hiding Cover (National Forest Lands in Elk Analysis Unit as Denominator) | Environmental Assessment Representation of Percentage of Elk Hiding Cover (Undisclosed Denominator) |
|---|---|---|
| Buffalo Horn – Spring, Summer, Fall | 71% | 74% |
| Buffalo Horn- Winter | 21% | 22% |
| Cabin Creek – Spring, Summer, Fall | 22% | 34% |
| Cabin Creek – Winter | 36% | 57% |
| Henry's Mountains – Spring, Summer, Fall | 58% | 74% |
| Henry's Mountains - Winter | 18% | 23% |

81.   USFS represents that the Project will reduce hiding cover by the following

percentages:

- 1% reduction in spring, summer, and fall hiding cover in the Buffalo

  Horn Elk Analysis Unit,

- 2% reduction in winter hiding cover in the Buffalo Horn Elk Analysis

  Unit,

- 3% reduction in winter hiding cover in the Cabin Creek Elk Analysis

Unit, and

- 1% reduction in winter hiding cover in the Henry's Mountains Elk

    Analysis Unit.

82. In the Project Environmental Assessment, USFS does not disclose the

    numerator or denominator used to calculate the percentages listed above in

    paragraph 81.

83. Due to expected losses of hiding cover in this area from the Project, elk may

    reduce their use of Horse Butte. This would be most likely to occur during

    rifle hunting season.

84. Prolonged loss of hiding cover on Fir Ridge may cause elk to alter their

    migration routes to avoid this area in the fall. Surrounding topography and

    vegetation may restrict their ability to alter their migration route in a

    substantial way, which could increase elk vulnerability to hunting pressure

    in the fall in this area.

F.  PROJECT EFFECTS ON WEEDS

85. The weed infestation levels in Hebgen Basin are extensive.

86. USFS determined:  "Even with mitigation and careful design it will be

    difficult to say the project will not lead to more weed spread.  The

    significance of the impact is subjective and as a result difficult to

    affirmatively state that there would be 'no significant impact.'"

87.  In USFS's "cumulative effects checklist" for invasive weeds for the Project, USFS sets forth three options: (1) "may have cumulative effects with the proposal," (2) "may have insignificant cumulative effects with the proposal," and (3) "will not have cumulative effects with the proposal."

88.  Thus, the first option - "may have cumulative effects with the proposal" – is referring to cumulative effects that are *not* "insignificant" because may have "insignificant" cumulative effects is the second option.

89.  In USFS's "cumulative effects checklist" for invasive weeds, USFS repeatedly finds that past and ongoing activities in the Project area "may have cumulative effects with the proposal" for the Project regarding invasive weeds.

90.  For example, most of the clearcuts on the Flats currently have yellow toadflax. Now that this weed species is present in the area it will continue to spread into disturbed and undisturbed areas by people and wildlife.

91.  Another example is that road grading moves soil infected with weeds (dormant seeds and root fragments) to new locations.

92.  Another example is that weeds beyond 20 feet from the highway often are not treated. As a result, the harvest units next to the highway will likely become infected with weeds.

93.  Another example is that most of the snowmobile trails have weed

infestations, and weeds may spread from the winter trails into the adjacent
treatment units.

G.  LONESOME WOOD 2 PROJECT

94.    The Lonesome Wood 2 Project is a logging project that is currently being
implemented on the Gallatin National Forest on the Hebgen Lake Ranger
District.

95.    The Lonesome Wood 2 Project is located on the west and south side of
Hebgen Lake, whereas the North Hebgen Project is located on the north and
east side of Hebgen Lake.

96.    The Lonesome Wood 2 Project includes 1,750 acres of commercial logging
to remove larger trees. There is no diameter limit for that logging, and the
logging includes 495 acres of old growth forest. The Project also allows an
additional 825 acres of potentially commercial logging to remove smaller
trees (six inches or less in diameter), and 325 acres of slashing and/or
prescribed burning. The Project allows construction of six miles of new
temporary logging roads and the reopening/reconstruction of 2.8 miles of
formerly closed/restricted logging roads.  Full implementation of the
Lonesome Wood 2 Project is expected to take 8-12 years.

97.    The "analysis areas" for the North Hebgen Project are the areas used for
determining direct, indirect, and cumulative effects; USFS identifies and

describes an analysis area for each resource and they vary from resource to resource.

98. In the North Hebgen Project analysis, USFS uses the three affected "Elk Analysis Units" as the "analysis area" to assess impacts to elk.

99. The North Hebgen Project occurs in the Buffalo Horn, Cabin Creek, and Henry's Mountains Elk Analysis Units

100. The Lonesome Wood 2 Project occurs within the Henry's Mountains Elk Analysis Unit.

101. The North Hebgen Project Environmental Assessment states: "Implementation of Lonesome Wood 2 may overlap at least in part with implementation of this project. These effects would be distributed across the analysis area in space and time. Effects on elk across the analysis area due to these small losses in habitat effectiveness are expected to be minimal."

102. The North Hebgen Project Environmental Assessment states: "In addition to the 2,327 acres treated with Lonesome Wood 2 and the Rendezvous Trails projects, the cumulative effects of these treatments could, therefore, result in, at most, a total reduction of 2,369 acres of [spring, summer, and fall] hiding cover. . . ."

103. A cumulative reduction of 2,369 acres of spring, summer, and fall hiding cover from three logging projects in the Henry's Mountains Elk Analysis

Unit results in a reduction from 70,696 acres (existing) to 68,327 acres post-projects.

104. 68,327 acres of spring, summer, and fall hiding cover within 121,508 acres of National Forest lands within the Henry's Mountains Elk Analysis Unit results in a hiding cover percentage of 56%.

105. Other than the reduction of hiding cover from Lonesome Wood 2, the North Hebgen Project Environmental Assessment does not disclose any other quantitative details or details of potential cumulative effects of the Lonesome Wood 2 Project.

106. In the North Hebgen Project analysis, USFS uses the mountain range to assess impacts to old growth forest.

107. The North Hebgen Project occurs in the Madison and Henry's Mountain ranges.

108. Within the Madison Mountain Range, the North Hebgen Project will allow the logging of approximately 900 acres of old growth forest.

109. The Lonesome Wood 2 Project EIS states: "The Lonesome Wood Vegetation Management 2 project area is located in the southern part of the Madison Range west of Hebgen Reservoir."

110. The Lonesome Wood 2 Record of Decision authorizes the logging of approximately 495 acres of designated old growth forest.

111.    The North Hebgen Project Environmental Assessment fails to disclose
        detailed and quantified information that assesses the cumulative effects of
        the Project and the Lonesome Wood 2 Project on old growth.  Instead, it
        states: "Within the Madison Mountain range there are no currently or
        reasonably foreseeable vegetation management projects that would affect
        old growth on Custer Gallatin National Forest Lands."

112.    In the North Hebgen Project analysis, USFS uses the "Bear Management
        Unit" to assess impacts to grizzly bears.

113.    The Lonesome Wood 2 Project occurs in the Henry's Lake #2 Bear
        Management Subunit, which is directly adjacent to the Madison #1 and #2
        Bear Management Subunits, in which the North Hebgen Project occurs.

114.    The map below shows the location of both the Henry's Lake #2 Subunit, and
        the Madison #1 and #2 Subunits:

//

//

//

//

//

//

//



**Figure A2.** *Bear Management Units (BMUs) and subunits comprising the Grizzly Bear Recovery Zone in the Yellowstone Ecosystem.*

115. Although the Lonesome Wood 2 Project and the North Hebgen Project occur in directly adjacent Bear Management Subunits, the North Hebgen Environmental Assessment does not disclose or analyze the cumulative effects on grizzly bears from the two simultaneous, adjacent 8-12 year-long Projects.

116. In the North Hebgen Project analysis, USFS uses the "Lynx Analysis Unit" to assess impacts to lynx.

117. The North Hebgen Project occurs within the Upper Madison Lynx Analysis Unit and allows the logging of 483 acres of multistoried, mature forest that is mapped lynx habitat.

118.   The Lonesome Wood 2 Project occurs within the Henry's Lake Mountains
Lynx Analysis Unit and allows the logging of 1,548 acres of multistoried,
mature forest that is mapped lynx habitat.

119.   The Upper Madison Lynx Analysis Unit (North Hebgen) is directly adjacent
to the Henry's Lake Mountains Lynx Analysis Unit (Lonesome Wood 2) as
demonstrated by the maps below:

Figure 30.  Henry's Lake Mountains Lynx Analysis Units (LAU)





120.   Although the Lonesome Wood 2 Project and the North Hebgen Project occur
in directly adjacent Lynx Analysis Units, the North Hebgen Environmental
Assessment does not disclose or analyze the cumulative effects on lynx from
the two simultaneous, adjacent 8-12 year-long Projects.

H.  WILDFIRE

121.  Published, peer-reviewed literature does not support the premise that commercial logging will reduce fire risk in wet, high-elevation forests such as those affected by this Project.  For example, Schoennagel et al (2004) states: "we are concerned that the model of historical fire effects and 20th-century fire suppression in dry ponderosa pine forests is being applied uncritically across all Rocky Mountain forests, including where it is inappropriate []."

122.  Schoennagel et al (2004) states: "Mechanical fuel reduction in subalpine forests would not represent a restoration treatment but rather a departure from the natural range of variability in stand structure."

123.  Schoennagel et al (2004) states: "Given the behavior of fire in Yellowstone in 1988, fuel reduction projects probably will not substantially reduce the frequency, size, or severity of wildfires under extreme weather conditions."

124.  Schoennagel et al (2004) (emphasis added) states: "The Yellowstone fires in 1988 revealed that variation in fuel conditions, as measured by stand age and density, had only minimal influence on fire behavior. Therefore, *we expect fuel-reduction treatments in high-elevation forests to be generally unsuccessful in reducing fire frequency, severity, and size*, given the overriding importance of extreme climate in controlling fire regimes in this

zone. Thinning also will not restore subalpine forests, because they were dense historically and have not changed significantly in response to fire suppression. Thus, *fuel-reduction efforts in most Rocky Mountain subalpine forests probably would not effectively mitigate the fire hazard*, and these efforts may create new ecological problems by moving the forest structure outside the historic range of variability."

125.   Likewise, Brown et al (2004) (emphasis added) states: "At higher elevations, forests of subalpine fir, Engelmann spruce[], mountain hemlock [], and lodgepole or whitebark pine [] predominate. These forests also have long fire return intervals and contain a high proportion of fire sensitive trees []. At periods averaging a few hundred years, extreme drought conditions would prime these forests for large, severe fires that would tend to set the forest back to an early successional stage, with a large carry-over of dead trees as a legacy of snags and logs in the regenerating forest....natural ecological dynamics are largely preserved because fire suppression has been effective for less than one natural fire cycle. Thinning for restoration does not appear to be appropriate in these forests []. *Efforts to manipulate stand structures to reduce fire hazard will not only be of limited effectiveness* [] but may also move systems away from pre-1850 conditions to the detriment of wildlife and watersheds."

126. According to Graham et al (2004), thinning may increase the likelihood of wildfire ignition in the type of forests in this Project area: "The probability of ignition is strongly related to fine fuel moisture content, air temperature, the amount of shading of surface fuels, and the occurrence of an ignition source (human or lightning caused) []. Stand structure strongly influences all these factors. There is generally a warmer, dryer microclimate in more open stands (fig. 9) compared to denser stands []. Dense stands (canopy cover) tend to provide more shading of fuels, keeping relative humidity higher and air and fuel temperature lower than in more open stands. Thus, dense stands tend to maintain higher surface fuel moisture contents compared to more open stands []. More open stands also tend to allow higher wind speeds that tend to dry fuels compared to dense stands []. These factors may increase probability of ignition in some open canopy stands compared to dense canopy stands."

127. USFS's own research scientist, Dr. Jack Cohen, states: "It may not be necessary or effective to treat fuels in adjacent areas in order to suppress fires before they reach homes; rather, it is the treatment of the fuels immediately proximate to the residences, and the degree to which the residential structures themselves can ignite that determine if the residences

are vulnerable."

I.  AMENDMENT 51

128.  Amendment 51 to the Gallatin Forest Plan removed or modified 56 goals and standards from the Gallatin Forest Plan.

129.  Amendment 51 removed Forest-wide Goal 7, which stated: "Provide habitat for viable populations of all indigenous wildlife species and for increasing populations of big game animals."

130.  Amendment 51 removed the requirement in Forest-wide Standard 6 (a)(5) to map "moist areas (wallows etc.); foraging areas (meadows and parks); critical hiding cover (see Glossary in Chapter VI for definition); thermal cover; migration routes, and staging areas" for each Project.

131.  Amendment 51 modified the 2/3 hiding cover requirement in Forest-wide Standard 6(a)(5), in several ways:  (1) by setting the requirement to analyze hiding cover at the Elk Analysis Unit scale, (2) by limiting the requirement for hiding cover so that it now only applies to "Douglas-fir, lodgepole pine, and subalpine fir conifer forest types," (3) by limiting the requirement for hiding cover so that it now only applies to National Forest lands, (4) by changing the definition of hiding cover to require only 40% canopy cover, and (5) by setting the 2/3 requirement "to function as hiding cover for elk at any point in time."

132.  Amendment 51 eliminates the Appendix G, Timber and Fire Management Standard 4(A)(3) requirement that no point in clearcuts may be more than 600 feet from cover.

133.  Amendment 51 modified Forest-wide Standard 6(c)(2) in several ways:  (1) by eliminating the requirement that old growth be assessed at the smaller "Timber Compartment" level, and now requiring that old growth be assessed at the larger "mountain range" scale; (2) by eliminating the requirement that old growth be assessed as a percentage of the entire area, and now requiring that old growth only be assessed as a percentage of the forested area within the entire area; and (3) by removing the requirement to maintain at least 10% mature forest in additional to 10% old growth forest.

134.  Amendment 51 changed Forest-wide Standard 8(j) because the "existing Forest Plan standard [was] not consistent with the direction in the Northern Rockies Lynx Management Direction FEIS [] regarding thinning in snowshoe hare habitat."

135.  Amendment 51 eliminated the Timber Standard for Management Area 13, which stated:  "No commercial thinning is planned."

136.  Amendment 51 eliminated the Management Area 13 standard that required at least 30% of each timber compartment to be maintained as old growth,

and replaced it with a standard that requires that only 30% of the forest acres within a timber compartment must be maintained as "over-mature" forest, which has a less restrictive definition than Green et al "old growth."

137.   USFS concedes that Amendment 51 has "a potential effect on wildlife associated with old growth . . . ."

138.   USFS states that Amendment 51 may "possibly [have] some beneficial effect to [threatened/endangered species] wildlife (not considering grizzly bear here) at the project level by having clear up-to-date Forest Plan guidance."

J.  WOLVERINE

139.   The wolverine, a species proposed for listing as a threatened species under the ESA, may be present in the Project area.

140.   Wolverines have been detected in the Project area via Montana Fish, Wildlife, and Parks long-term transect monitoring.

141.   Montana Fish, Wildlife, and Parks stated:  "We highly recommend that you carefully address how the potential benefits of [whitebark pine] improvements will occur so as not to be deleterious to wolverines. If the proposed project will increase recreational travel (i.e. snowmobile use), we strongly recommend that you consult with Dr. Bob Inman to discuss direct and indirect effects on wolverine habitat, especially during the denning and

natal rearing periods. Dr. Inman has extensive knowledge of the area; the impacts of winter recreation on wolverines and is one of the nation's experts in wolverine ecology (see Inman et al. 2013)."

142.  The Forest Service concedes that "wolverine . . . are known to occupy the area" and that wolverines "show a preference[] for areas with low disturbance."

143.  The Project Environmental Assessment states:  "According to habitat models developed by Inman et al. (2013), the entire project area is located in suitable dispersal habitat for both male and female wolverine, meaning that these areas are suitable for use on the order of days or weeks. All of the units at the end of Tepee Creek Road (designed to enhance whitebark pine) and Units 166, 172, 173, 174, 175, 176, 177, 178, 180, 185, and 214 on Tepee Creek Road are all located in primary wolverine habitat. Primary habitat refers to areas that are suitable for long-term survival (year-round, long-term use by resident adults)."

144.  The Project Environmental Assessment also states:  "Activities associated with implementation of the action alternatives would include increased human presence and operation of heavy machinery in the project area. This could result in disturbance to wolverines, including interruptions in dispersal, foraging, and, to a very small degree, denning. During

implementation, it is expected that wolverines would alter their patterns and use nearby undisturbed habitats and resume their normal behavior."

145.   The Project Environmental Assessment also states:  "During project implementation, big game are likely to avoid the project area and, thus, would reduce foraging opportunities for wolverine in the short-term."

146.   The Project Environmental Assessment also states:  "Implementation of the action alternatives would add to disturbance factors affecting wolverine. If wolverines are already disturbed by recreational activities occurring on Tepee Creek Road, project activities may further reduce suitability of the area while implementation is taking place."

147.   The Project Environmental Assessment concludes:  "The action alternatives may displace wolverine from the project area through disturbance of both individual wolverines and their prey."

## VII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

The Project violates the Forest Plan hiding cover standard and/or the Forest Plan hiding cover standard is arbitrary and capricious.

148.   All previous paragraphs are incorporated by reference.

149.   The Forest Plan hiding cover standard states:  "Vegetation treatment projects (e.g. timber harvest, thinning and prescribed burning) shall maintain at least

two-thirds (2/3) of Douglas fir, lodgepole pine, and subalpine fir conifer

forest cover types (on National Forest System lands) with at least 40%

canopy cover (on National Forest System lands), to function as hiding cover

for elk at any point in time. Hiding cover will be assessed for an elk analysis

unit (EAU) which is based on a collaborative mapping effort between the

local state (MDFWP) wildlife biologist and the local Forest Service wildlife

biologist."

150.   Contrary to this standard, in the Project Environmental Assessment, USFS

did not use National Forest lands within the Elk Analysis Unit as the

denominator for its hiding cover calculations.  Instead it used an undisclosed

denominator.  This failure violates the Forest Plan and thereby violates

NFMA.   The failure to clearly disclose the denominator for its hiding cover

calculations, and indicate why USFS believes that denominator is an

accurate and representative sample size, also violates NEPA.

151.   If USFS had used National Forest lands within the Elk Analysis Unit as the

denominator for its hiding cover calculations, the Project would violate the

2/3 standard in at least one Elk Analysis Unit:  Cabin Creek Elk Analysis

Unit currently has only 22% elk hiding cover in spring, summer, and fall,

and 36% elk hiding cover in winter.  Even if these percentages could be

added together, it would still amount to only 58% hiding cover, and the

Project will further reduce hiding cover in that Elk Analysis Unit despite already failing the 2/3 requirement. This action violates the Forest Plan and thereby violates NFMA.

152. Furthermore, the new Forest Plan standard for hiding cover requires 2/3 "hiding cover for elk at any point in time." In the point of time that is spring, summer, or fall, the Cabin Creek Elk Analysis Unit has only 22% hiding cover and the Henry's Mountains Elk Analysis Unit has only 58% elk hiding cover. Additionally, in the point of time that is winter, all three Elk Analysis Units have less than 2/3 hiding cover (Buffalo Horn – 21%, Cabin Creek – 36%, and Henry's Mountains – 18%). The failure to maintain 2/3 hiding cover for elk "at any point in time" and the Project allowance for logging that further reduces these percentages violates the Forest Plan and violates NFMA. In the very least, USFS's failure to discuss the "at any point in time" requirement and explain why it does not require 2/3 hiding cover in each season, violates NEPA.

153. Finally, USFS states or implies that the reason it did not use the National Forest lands in the Elk Analysis Unit as the denominator for the elk hiding cover calculations is that it does not have data for all of the National Forest lands within the Elk Analysis Units. If this is true, then the new Forest Plan hiding cover standard is arbitrary and capricious because it requires the use

of a denominator that is impossible for USFS to use in practice at the project

level.

154. For the above-stated reasons, USFS is violating NEPA, NFMA, and the

APA.

## SECOND CLAIM FOR RELIEF

 USFS's failure to prepare a full EIS for the Project violates NEPA and the APA.

155. All previous paragraphs are incorporated by reference.

156. To prevail on the claim that a federal agency was required to prepare an EIS

under NEPA, the plaintiffs need not demonstrate that significant effects *will*

occur. A showing that there are "*substantial questions* whether a project may

have a significant effect on the environment" is sufficient to trigger this

requirement.

157. To determine whether there may be a significant impact, the following

factors must be considered:  (1) Impacts that may be both beneficial and

adverse. A significant effect may exist even if the Federal agency believes

that on balance the effect will be beneficial; (2) The degree to which the

proposed action affects public health or safety; (3) Unique characteristics of

the geographic area such as proximity to historic or cultural resources, park

lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically

critical areas; (4) The degree to which the effects on the quality of the

human environment are likely to be highly controversial; (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; (6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts; (8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973, and (10) Whether the action threatens a violation of Federal, State, or local law.

158.   "[I]n the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant."

159.   "Significance cannot be avoided by terming an terming an action temporary or by breaking it down into small component parts."

160.   "A significant effect may exist even if the Federal agency believes that on

balance the effect will be beneficial."

161.    There are substantial questions regarding whether the Project may have significant impacts for the following reasons:  (1) the Project will cause adverse effects to grizzly bears and requires an exemption from the Grizzly Bear Conservation Strategy protections in an area that already has some of the most degraded habitat in the Recovery Zone; (2) the Project will cause adverse effects to lynx, a threatened species listed under the ESA, and requires exemptions from the protective standards of the Lynx Amendment; (3) there are significant cumulative effects posed by the Project and the directly adjacent 8-12 year long Lonesome Wood 2 logging project; (4) the Project allows the logging of hundreds of acres of old growth forest; (5) the underlying premise of the Project that commercial logging in high-elevation, wet forests will reduce fire severity is highly controversial and not supported by peer-reviewed scientific literature; (6) the Project violates the Gallatin Forest Plan standard that limits instream sediment in Class A trout streams, and therefore required an exemption from that standard; (7) the Project, in addition to past and ongoing activities, may have cumulative effects on the spread of invasive weeds in the Project area.

162.    For the above-stated reasons, there are substantial questions regarding whether the Project may have significant effects; therefore, USFS's failure

to prepare a full EIS for the Project violates NEPA and the APA.

## THIRD CLAIM FOR RELIEF

### The Environmental Assessment for the Project does not take a hard look at the potential cumulative effects of the North Hebgen Project.

163.   All previous paragraphs are incorporated by reference.

164.   In a NEPA analysis, USFS must address the cumulative effects of its proposed action.

165.   The regulations define "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."

166.   A cumulative effects analysis must have at least some detailed or quantified information to pass legal muster, and the analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects.

167.   Providing no quantified assessment of the combined environmental impacts of reasonably foreseeable logging projects violates this basic NEPA requirement.

168.  As note above, the Lonesome Wood 2 Project is a logging project that is currently being implemented on the Gallatin National Forest on the Hebgen Lake Ranger District; it is directly adjacent to the North Hebgen Project.

169.  Although both Projects occur in the Madison Mountain Range, the North Hebgen Environmental Assessment falsely states:  "Within the Madison Mountain range there are no currently or reasonably foreseeable vegetation management projects that would affect old growth on Custer Gallatin National Forest Lands."  Thus, USFS fails to disclose and analyze the cumulative effects from the logging of hundreds of acres of old growth forest between the two Projects.

170.  Although both Projects occur in directly adjacent Lynx Analysis Units, USFS fails to disclose and analyze the cumulative effects from the logging of hundreds of acres of mapped lynx habitat between the two Projects.

171.  Although both Projects occur in directly adjacent Bear Management Subunits, USFS fails to disclose and analyze the cumulative effects from the logging of hundreds of acres of forest cover and the construction of over 20 miles of temporary logging roads between the two Projects.

172.  USFS does disclose the fact that both Projects occur within the Henry's Mountains Elk Analysis Unit.

173.  The North Hebgen Project Environmental Assessment states:

"Implementation of Lonesome Wood 2 may overlap at least in part with implementation of this project. These effects would be distributed across the analysis area in space and time. Effects on elk across the analysis area due to these small losses in habitat effectiveness are expected to be minimal."

174. The North Hebgen Project Environmental Assessment further states: "In addition to the 2,327 acres treated with Lonesome Wood 2 and the Rendezvous Trails projects, the cumulative effects of these treatments could, therefore, result in, at most, a total reduction of 2,369 acres of [spring, summer, and fall] hiding cover. . . ."

175. Other than the reduction of hiding cover from Lonesome Wood 2, the North Hebgen Project Environmental Assessment does not disclose any other quantitative details or details of potential cumulative effects of the Lonesome Wood 2 Project.

176. USFS's failure to take a hard look and fully and fairly disclose quantified and detailed information about the cumulative effects of the North Hebgen and Lonesome Wood 2 Projects violates NEPA and the APA.

FOURTH CLAIM FOR RELIEF

The agencies' failure to consult on lynx and lynx critical habitat for Gallatin Forest Plan Amendment 51 violates the ESA and APA.

177. All previous paragraphs are incorporated by reference.

178.   The Ninth Circuit holds that actions that have any chance of affecting listed species or critical habitat – even if it is later determined that the actions are not likely to do so – require at least some consultation under the ESA.

179.   "May affect" is a low threshold and any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the requirement.

180.   While the disturbance effects may be discountable or insignificant, any possible effect requires USFS to obtain the concurrence of FWS in order to avoid formal Section 7 consultation.

181.   As discussed above, Amendment 51 to the Gallatin Forest Plan eliminated or modified 56 goals and standards in the Forest Plan.

182.   The on-the-ground repercussions of Amendment 51 will include less old growth forest, less hiding cover, and larger clearcuts.

183.   All three of these effects will degrade habitat for lynx, which is a species that requires large areas of dense, mature forest.

184.   As USFS itself states in the Amendment 51 NEPA analysis:  Amendment 51 has "a potential effect on wildlife associated with old growth . . . ."

185.   USFS also states in the Amendment 51 NEPA analysis that Amendment 51 may "possibly [have] some beneficial effect to [threatened/endangered species] wildlife (not considering grizzly bear here) at the project level by having clear up-to-date Forest Plan guidance."

186.   Despite the possible and potential effects on lynx, the agencies did not conduct ESA consultation for lynx for Amendment 51.

187.   The agencies' refusal to conduct ESA consultation for lynx for Amendment 51, and USFS's conclusion that Amendment 51 would have "no effect" on lynx, are arbitrary and capricious and violate the ESA and APA.

FIFTH CLAIM FOR RELIEF

The Forest Service's failure to analyze Project effects on the wolverine in the North Hebgen Project Biological Assessment and then receive concurrence from FWS violates the ESA and APA.

188.   All previous paragraphs are incorporated by reference.

189.   Wolverines were proposed for listing under the ESA most recently in April 2016.

190.   Wolverines may be present in the Project area and Project activities may affect wolverines.

191.   If, within an action area, a listed or proposed species "may be present, [the action] agency shall conduct a biological assessment . . . ." 16 U.S.C. §1536(c)(1).

192.   The Final Rule for ESA Section 7 consultation regulations requires that the action agency address proposed species in a biological assessment:  "A biological assessment contains information concerning listed or proposed

species . . . that may be present in the action area and an evaluation of any potential effects of the action on such species and habitat.  A biological assessment should be used in determining whether formal consultation or a conference is required."  51 Fed. Reg. 19940 (June 3, 1996).

193.   The regulations state:  "Biological assessment refers to the information prepared by or under the direction of the Federal agency concerning listed and proposed species and designated and proposed critical habitat that may be present in the action area and the evaluation potential effects of the action on such species and habitat."  50 C.F.R. 402.02.

194.   The regulations state:  "A biological assessment shall evaluate the potential effects of the action on listed and proposed species . . . and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary."  50 C.F.R. 402.12(a).

195.   The regulations state:  "The Federal agency shall submit the completed biological assessment to the Director for review. . . . If the biological assessment indicates that the action is not likely to jeopardize the continued existence of proposed species . . .  and the Director concurs, then a conference is not required."  50 C.F.R. 402.12 (j)(k).

196. Therefore, as stated in the ESA Section 7 Handbook: "if both proposed and listed species are present, a biological assessment is required and must address both proposed and listed species."

197. The Forest Service prepared a December 2016 biological assessment for the North Hebgen Project and included and analyzed grizzly bears and lynx, but the agency did not include the wolverine, or analyze Project effects on the wolverine, in the biological assessment for the North Hebgen Project.

198. The Forest Service's failure to include the wolverine, and analyze Project effects on wolverine, in the North Hebgen Project biological assessment, and then receive concurrence from FWS, violates the ESA and APA and is arbitrary and capricious.

## VIII. RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A. Declare that the Project and/or Amendment 51 violates the law;

B. Enjoin implementation of the Project;

C. Award Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees under the ESA and/or under EAJA; and

D. Grant Plaintiffs any such further relief as may be just, proper, and equitable.

Respectfully submitted this 7th Day of August, 2018.


*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Kristine Akland
AKLAND LAW FIRM, PLLC

Attorneys for Plaintiffs