

FILED
AUG 13 2018
Clerk, U.S District Court
District Of Montana
Missoula

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES, <br><br> Plaintiffs, <br><br> vs. <br><br> LEANNE MARTEN, Regional Forester, USFS Region One, U.S. FOREST SERVICE, and U.S. FISH & WILDLIFE SERVICE, <br><br> Defendants. | CV 18–87–M–DLC <br><br> ORDER |

On June 15, 2018, Plaintiffs filed a Motion for Preliminary Injunction/Temporary Restraining Order (Doc. 6) supported by the declaration of Michael Garrity, the Executive Director of Plaintiff Alliance for the Wild Rockies ("AWR"), and an excerpt of the Flathead National Forest Plan Amendment 21 Final Environmental Impact Statement ("Amendment 21"). (Docs. 6-1; 6-2.) On June 27, 2018, this Court granted Plaintiffs' request for a temporary restraining order. (Doc. 8 at 5.) On June 29, 2018, Defendants filed both a Motion to Dissolve Temporary Restraining Order (Doc. 10) and a Motion to Strike Plaintiffs' Exhibit 1 (Doc. 12), which is Amendment 21. Per the Court's Order, the

-1-

temporary restraining order automatically expired on July 20, 2018, the day a hearing on Plaintiffs' Motion for a Preliminary Injunction was held. (Doc. 8 at 5.) Consequently, Defendants' Motion to Dissolve the Temporary Restraining Order will be denied as moot. For the following reasons, Plaintiffs Motion for Preliminary Injunction will be granted and Defendants Motion to Strike will be denied.

## DISCUSSION

At issue is the United States Forest Service's ("USFS") North Hebgen Project in the Custer-Gallatin National Forest. Plaintiffs assert that Defendants failed to conduct Endangered Species Act ("ESA") consultation on Gallatin Forest Plan Amendment 51 ("Amendment 51"), the Forest Plan controlling the North Hebgen Project, despite the fact that the changes included in Amendment 51 may have an effect on lynx, a species listed as threatened under the ESA (*Id.* at 26 (citing A-5:NH000224).)

Plaintiffs allege that Amendment 51 replaced the existing standard requiring the retention of 30% of "old growth" forest with a less-stringent standard pertaining to "over-mature" forest, which would allow the initially non-compliant North Hebgen Project to comply with the forest plan. (Doc. 6 at 24–25 (citing D-7:NH002605–

06).) Plaintiffs argue that this change, compounded with numerous other changes,[1] "collectively reduce the quality and amount of 'old growth' and mature forest protection on the Gallatin National Forest." (*Id.* at 25–26.) Moreover, Plaintiffs point out that USFS noted that the replacement of the "old growth" standard with the "over-mature" standard has "'a potential effect on wildlife associated with old growth.'" (*Id.* at 26 (quoting D-10: NH003238).) After pointing to the alleged concession on the part of USFS, Plaintiffs cite to Amendment 21 as proof that USFS considers "lynx to be a species associated with old growth forest." (*Id.* at 22 (citing Doc. 6-2 at 59, 61).)

Plaintiffs assert that USFS' statement that Amendment 51 could have "a potential effect on wildlife associated with old growth" coupled with USFS' statement in Amendment 21[2] that lynx "is included on the list of old growth associated species," means that Amendment 51 "may effect" lynx. (Doc. 16 at 8–11.) Additionally, Plaintiffs allege that USFS also states that Amendment 51 "could possibly [have] some beneficial effect to [Threatened, Endangered, or

---

[1] As the Court ultimately finds that this change alone supports a likelihood of success on the merits, the Court refrains from analyzing the potential merit of Plaintiffs other allegations and the Parties' corresponding arguments.

[2] During oral argument, Plaintiffs bolstered their opinion that USFS considers lynx to be an old growth associated species by pointing to numerous places in the record which support this uncontested assertion. *See, e.g.*, P-70:NH022454 ("Mature forest is the most stable and consistent annual forest structure type for snowshoe hares and lynx.")

Sensitive ("TES")] wildlife" immediately succeeding a discussion of Amendment 51's effect on bald eagles, peregrine falcons, and lynx, meaning that Amendment 51 is considered to have a potential beneficial effect on lynx. (Doc. 6 at 27 (quoting D-10:NH003247).) Plaintiffs contend that these statements clearly indicate that Amendment 51 may have an effect on lynx.

"An agency has a duty to consult under Section 7 of the ESA for any discretionary agency action that may affect a listed species or designated critical habitat." *Karuk Tribe of California v. U.S. Forest Service*, 681 F.3d 1006, 1027 (9th Cir. 2012) (internal quotation marks and citation omitted). Plaintiffs assert that Defendants failed to "conduct ESA Section 7 consultation on Amendment 51 for lynx or lynx critical habitat" despite the fact that Amendment 51 may affect lynx. (Doc. 6 at 28.) Plaintiffs seek a preliminary injunction enjoining the North Hebgen Project while this Court determines the merits of their claim. As Plaintiffs' Motion relies partially on the supplementation of the record, the Court begins by addressing Defendants' Motion to Strike Amendment 21 from the record.

## I. Defendant's Motion to Strike

ESA claims are reviewed under the Administrative Procedures Act ("APA") "irrespective of whether an ESA claim is brought under the APA or the citizen-suit

provision." *Alliance for the Wild Rockies v. Krueger*, 664 Fed. Appx. 674, 675 (9th Cir. 2016) (internal quotation marks and citation omitted). Judicial review of actions brought under the APA limit the scope of review to the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The initial presumption is that the agency properly designated the administrative record. *Cook Inletkeeper v. EPA*, 400 F3d. Appx. 239, 240 (9th Cir. 2010) (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)). However, the whole administrative record is not necessarily what has been submitted by the agency, because it includes documents and materials both directly and indirectly considered by agency decision-makers. *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).

Four exceptions to this rule are generally considered for supplementation of an administrative record: (1) when necessary to determine whether the agency has considered all relevant factors and explained its decision, (2) when the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) (citing *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)).

Plaintiffs quote *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011) for the proposition that the APA does not limit this Court to solely the administrative record when reviewing an ESA claim. (Doc. 15 at 2–3.) This Court has held that

> *Kraayenbrink* leaves us uncertain whether the panel discarded the APA record review rule entirely or simply found that the extra-record documents presented to the district court in that case fit within one of the four standard exceptions outlined above. The better view, in the opinion of this Court, is that the traditional four exceptions still apply to plaintiffs' requests for supplementation of the administrative record for ESA claims, but the narrowness of the construction and application of these exceptions, *see Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir.2005) ("these exceptions are narrowly construed and applied"), should be relaxed for such claims.

*Alliance for the Wild Rockies v. Kruger*, 950 F. Supp. 2d 1172, 1177 (D. Mont. 2013). Absent more conclusive guidance, the Court maintains this position regarding the applicability of the Ninth Circuit's statements in *Kraayenbrink* to the four exceptions for supplementation of the administrative record.

Plaintiffs bear the burden of establishing that the proposed extra-record submissions fit within these relaxed exceptions in this case. *Ctr. for Biological Diversity*, 450 F.3d at 943. Here, however, Plaintiffs have presented no argument concerning the application of any of the four exceptions. Nonetheless, the Court finds Plaintiffs' statement made during oral argument—that they included

Amendment 21 to provide a quotation from the Forest Service saying that lynx are an old growth associated species—amenable to application of the third exception. Amendment 21 states that "lynx [are] included on the list of old growth associated species." (Doc. 6-2 at 59.) Although the Court remains without an explanation for why Plaintiffs neglected to approach supplementation in this manner, the Court is satisfied that it is within the Court's discretion to allow supplementation of the record to explain that lynx are an old growth associated species. Consequently, Defendant's Motion to Strike will be denied and the Court declines to address the Parties' additional arguments on this point.

## II. Motion for Preliminary Injunction

The purpose of a preliminary injunction is to preserve the status quo and prevent the "irreparable loss of rights" before a final judgment on the merits. *Textile Unlimited, Inc. v. A. BMH and Co.*, 240 F.3d 781, 786 (9th Cir. 2001). A preliminary injunction is an extraordinary remedy and should not be awarded as a matter of right, but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Nevertheless, in ESA cases, Congress intended for courts to be guided by a policy of "institutionalized caution" when confronted with requests for injunctive relief

regarding listed species under the ESA. *Cottonwood Envtl. Law Ctr. v. USFS*, 789 F.3d 1075, 1091 (9th Cir. 2015). (internal quotation marks and citation omitted).

Generally, a party seeking a preliminary injunction must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. However, consistent with the policy of "institutionalized caution," the test is altered in ESA cases so that "the equities and public interest factors always tip in favor of the protected species." *Cottonwood*, 789 F.3d at 1090–91. Indeed, "courts do not have discretion to balance the parties' competing interests in ESA cases because Congress 'afforded first priority to the declared national policy of saving endangered species.'" *Id.* at 1090 (quoting *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978)). And, "Congress established an unparalleled public interest in the 'incalculable' value of preserving endangered species." *Id.* (quoting *Hill*, 437 U.S. at 187). Accordingly, the Court is satisfied that the balance of equities and public interest accrue in favor of a preliminary injunction in this ESA case.[3] The Court proceeds to discuss the remaining two factors.

---

[3] Although Defendants have argued that both the balance of equities and public interest factors militate against enjoining this project, Defendants did not address the altered *Winter* test employed in evaluating the need for a preliminary injunction in ESA cases. (Doc. 9 at 30–37.) Because these factors "*always* tip in favor of the protected species," the Court declines to address

-8-

## A. Likelihood of Success on the Merits

"Serious questions on the merits" are those questions that present a "fair ground for litigation and thus for more deliberative investigation." *Republic of the Philipines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988). "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (quoting *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985). Here, Plaintiffs have presented questions concerning Defendants' compliance with the directives of the ESA which the Court finds have a "fair chance of success on the merits." At least, the complexity of Plaintiffs' case, from this preliminary standpoint, presents a "fair ground for litigation and thus for more deliberative investigation."

Agency actions "that have any chance of affecting listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so— require at least some consultation under the ESA." *Karuk Tribe*, 681 F.3d at 1027. The consultation requirement may only be avoided if the agency "determines that its action will have 'no effect' on a listed species or critical habitat." *Id.* (quoting *Southwest Ctr. for Biological Diversity*, 100 F.3d at 1447–48). "May affect" is a

---

Defendants' balance of equities and public interest arguments. *Cottonwood*, 789 F.3d at 1090– 91 (emphasis added).

-9-

"relatively low threshold for triggering consultation;" indeed, "[a]ny possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the requirement." *Id.* (internal quotation marks and citations omitted).

In this case, Plaintiffs have presented sufficient argument to support the likelihood that Defendants have failed to comply with their Section 7 obligations under the ESA as regards lynx, a species listed as threatened under the ESA. Based on Defendants' statement that Amendment 51 could have a "potential effect on wildlife associated with old growth," D-10:NH003238, the Court is convinced that there is fair ground for litigation on whether or not Section 7 consultation is required to address this possible effect to lynx, an old growth associated species.

Defendants assert that the Gallatin National Forest is managed pursuant to the Northern Rockies Lynx Management Direction ("Lynx Amendment"), which controls the North Hebgen Project "both before and after Amendment 51." (Doc. 9 at 15.) Because Amendment 51 "did not change the Lynx Amendment," (*Id.* at 17), Defendants determined that Amendment 51 "does not have any direct effects to lynx or snowshoe hares, since the Forest Service is following the standards in the [Lynx Amendment.]" D-10:NH003247. Defendants contend that this "no effect" determination does not trigger Section 7 consultation and "must be upheld if it is reasonable and supported by the record." (Doc. 9 at 16 (citing

*Kraayenbrink*, 632 F.3d at 496).) Further, Defendants argue that because "[a]ny management activity implemented under Amendment 51 that has the potential to affect lynx and lynx habitat must also comply with the Lynx Amendment," Plaintiffs concerns are rendered irrelevant. (*Id.* at 19.)

First, the Court is not convinced that Defendants' "no effect" determination is supported by the record. At least, it appears that there is fair ground for litigation on this point owing to Defendants' uncontroverted statement[4] that Amendment 51 could have a "potential effect on wildlife associated with old growth." D-10: NH003238.

As Plaintiffs countered, Defendants' argument regarding the Lynx Amendment incorrectly "presumes that no other Forest Plan provision 'may affect' lynx, and that lynx 'may be present' only in areas where the Lynx Amendment applies." (Doc. 16 at 8.) The Lynx Amendment only applies to "mapped lynx habitat on National Forest System land presently occupied by Canada lynx." D-

---

[4] Although Defendants assert that it has not been conceded that Amendment 51 "may affect" lynx, their argument does not focus on persuading the Court of this. Instead, Defendants focus on the source of Plaintiffs assertion that lynx are an "old growth associated species," while also failing to contest this fact. (Doc. 9 at 17–18.) The Court finds that there is fair ground for litigation on this assertion given Defendants' uncontroverted statement that Amendment 51 could have a "potential effect on wildlife associated with old growth." D-10: NH003238. The Court is similarly unconvinced that Defendants' "possibl[e] beneficial effect" statement has been mischaracterized since it comes immediately after a discussion of lynx and references "TES wildlife." D-10:NH003247. Further, Defendants also state that Amendment 51 could "possibly [provide] some beneficial effect to wildlife associated with old growth forest." D-10:NH003241.

-11-

3:NH002396. While this project does include mapped lynx habitat, the entire project is not "mapped lynx habitat" and, therefore, the Lynx Amendment does not apply to all areas affected by Amendment 51. Additionally, Defendants consider lynx "to be present on the [Hebgen Lake Ranger] District." A-5:NH000226. This statement does not differentiate between the entire Hebgen Lake Ranger District and those areas already designated as mapped as lynx habitat, instead implying that lynx may be present anywhere in the District. Since Lynx may be present in areas outside of mapped lynx habitat, yet still within the area affected by Amendment 51, there are potentially areas where the changes implemented by Amendment 51 "may affect" lynx but where compliance with the Lynx Amendment is not required. If changes implemented in Amendment 51 could have "a potential effect on wildlife associated with old growth," irrespective of where on the project these effects are felt, then Amendment 51 "may effect" lynx irrespective of the Lynx Amendment, creating the potential that Plaintiffs arguments are not irrelevant and deserve more deliberative investigation.

The Court is satisfied that Plaintiffs have established "fair ground for litigation and thus for more deliberative investigation," *Republic of the Philipines*, 862 F.2d at 1362, regarding whether Amendment 51 "may affect" lynx—"a relatively low threshold for triggering [Section 7] consultation," *Karuk Tribe*, 681

F.3d at 1027. Additionally, the Court is convinced that this finding is consistent with the policy of "institutional caution" Congress intended to "guide district courts when confronted with requests for injunctive relief in ESA cases." *Cottonwood*, 789 F.3d at 1091 (internal quotation marks and citation omitted). Since lynx may be present in areas outside of those areas within the project designated as mapped lynx habitat, the Court is wary of allowing project activities to proceed which could diminish the viability of old growth forest, which is the "most stable and consistent annual forest structure type for snowshoe hares and lynx." P-70:NH022454.

## B. Irreparable Injury

The Ninth Circuit has established that demonstrating "irreparable injury should not be an onerous task for plaintiffs." *Id.* at 1091 (citing 16 U.S.C. § 1531). Consistent with this statement, the Ninth Circuit has been satisfied by a showing that plaintiffs "use the project area for wildlife viewing, and the projects will clearly cause harm to significant portions of lynx habitat," *Alliance for the Wild Rockies v. Christensen*, 663 Fed. Appx. 515, 517 (9th Cir. 2016), or an expressed desire to visit the area in an undisturbed state, *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Here, Plaintiffs have expressed just such use and desire through the declaration of Michael Garrity ("Garrity"). (Doc.

-13-

6-1 at 2–5.) Garrity states that AWR members have a particular interest in viewing "old growth associated wildlife species undisturbed in their natural surroundings." (*Id.* at 2–3.) As further explained by Garrity, "[i]f operations are allowed to proceed as planned, the area will be irreversibly degraded because once logging occurs, the Forest Service cannot put the trees back on the stumps, and our interests in the area will be irreparably harmed." (*Id.* at 5.) The Court is convinced that Garrity's declaration satisfies Plaintiffs' non-onerous task of establishing irreparable injury.

Defendants argue that Plaintiffs "fail to demonstrate that irreparable harm to the lynx is likely from the North Hebgen Project." (Doc. 9 at 29.) Quoting *South Yuba River Citizens League v. National Marine Fisheries Service*, 2013 WL 4094777, at *7 (E.D. Cal. Aug. 13, 2013), Defendants claim that Plaintiffs need a "'concrete showing of probable deaths' arising from the Project [and] 'how these deaths may impact the species.'" (Doc. 9 at 29.) However, this assertion is insupportable when the cited decision of the United States District Court for the Eastern District of California was prior to the Ninth Circuit's decision in *Cottonwood*, is inconsistent with that Court's directive that "establishing irreparable injury should not be an onerous task" in ESA cases, *Cottonwood*, 789 F.3d at 1091, and involved a request for "mandatory injunctive relief" which "goes

well beyond simply maintaining the status quo," *S. Yuba River Citizens League*, 2013 WL 4094777, at *6. The Court is convinced that, without Section 7 consultation, the reduction of old growth forest across the project area could potentially cause irreparable injury to lynx, consistent with the Court's policy of "institutionalized caution" regarding potential harm to TES wildlife.

Citing to *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984); and *Flint v. Dennison*, 336 F. Supp. 2d 1065, 1070 (D. Mont. 2004), Defendants' assert that Plaintiffs' delay in seeking relief "demonstrates a lack of urgency and undermines their claim of irreparable harm." (Doc. 9 at 26–27.) Defendants state that Plaintiffs were aware that the project was going to begin on July 1, 2018, as early as August 31, 2017—nearly ten months before Plaintiffs filed their Motion on June 15, 2018. (*Id.* at 27.) However, Defendants expect more from the cited cases than their facts will allow. The Court in *Oakland Tribune* was addressing a problem which had "been in effect for a number of years." 762 F.2d at 1377, while the Court in *Lydo Enterprises* was dealing with a plaintiff who had "delayed five years before taking any action," 745 F.2d at 1213. In *Flint*, the delay of approximately one year was "not alone a basis to withhold relief, [but] is a fact to be considered in measuring the claim of urgency." 336 F.

Supp. 2d at 1070. Here, we are dealing with a delay of months. While the timing of Plaintiffs Motion is not ideal for either the Defendants or the Court, the Court is not convinced that a ten-month delay should impact the efficacy of Plaintiffs' request.[5]

Lastly, Defendants contend that any injunction should be limited solely to those "portions of the Project that could affect lynx habitat." (Doc. 9 at 38.) However, as discussed above, Plaintiffs allege that Amendment 51 will reduce old growth forest across the project area which, in turn, may affect lynx that are considered to be present in these areas. Accordingly, the entire project must be enjoined to preserve the status quo until a decision on the merits can be reached.

In light of the above, IT IS ORDERED that Plaintiffs' Motion (Doc. 5) is GRANTED. Defendants are enjoined from implementing the North Hebgen Project until this case has reached a decision on the merits.

IT IS FURTHER ORDERED that Defendants' Motion to Dissolve Temporary Restraining Order (Doc. 10) is DENIED AS MOOT and Motion to Strike (Doc. 12) is DENIED.

---

[5] The Court declines to address Defendants' argument regarding the unreasonableness of Plaintiffs' expectation of an undisturbed landscape because Garrity's affidavit sufficiently transcends this single expectation and apprehension of harm. (Doc. 6-1 at 1–5.)

DATED this 13th day of August, 2018.

／s／ Dana L. Christensen
Dana L. Christensen, Chief Judge
United States District Court