IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

FILED

MAR 2 6 2020

Clerk, U.S. District Court
District Of Montana
Missoula

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES, | CV 18–87–M–DLC |
| Plaintiffs, | ORDER |
| vs. | |
| LEANNE MARTEN, Regional Forester, USFS Region One, U.S. FOREST SERVICE, and U.S. FISH & WILDLIFE SERVICE, | |
| Defendants. | |

Before the Court are Plaintiffs Native Ecosystems Council and Alliance for the Wild Rockies' ("Plaintiffs") Motion for Summary Judgment (Doc. 40), Federal Defendants Cross Motion for Summary Judgment (Doc. 51), and Defendant-Intervenor Sun Mountain Lumber, Inc.'s (collectively "Defendants") Cross Motion for Summary Judgment (Doc. 55). Plaintiffs have also filed a Motion to Supplement the Administrative Record. (Doc. 43.) The Court held a hearing on November 13, 2019. Then, on January 14, 2020, the Court ordered the parties to provide supplemental briefing on Defendants' contention that no biological assessment was required for wolverine because the North Hebgen Multiple

1

Resource Project ("North Hebgen Project" or "Project") is not a major construction activity. For the reasons explained, the Court now grants in part and denies in part the parties' respective motions.

## BACKGROUND

The Project is located within the Greater Yellowstone Ecosystem on the Hebgen Ranger District of the Custer-Gallatin National Forest, just north of West Yellowstone, Montana. NH 000073. The Project area is immediately adjacent to Yellowstone's western boundary, encompassing the Horse Butte Peninsula. It is bordered to the north by the Tepee Creek drainage and to the south by the Madison arm of Hebgen Lake. *Id.* The Project is designed to minimize damage from fire, improve forest health, and decrease human-grizzly bear interactions at a popular campground. NH 000075. Eighty percent of the Project will occur within the wildland urban interface. *Id.* The Project involves 5,670 acres of treatment, including treatment of 908 acres of actual and possible old growth forest within the Madison Mountain Range. *See* NH 000116. The Project would require the construction of 15.6 miles of new roads and take 8 to 12 years to complete. NH 000086.

**LEGAL STANDARDS**

## I.    The National Environmental Policy Act

The National Environmental Policy Act ("NEPA") "has twin aims. First, it
places upon [a federal] agency the obligation to consider every significant aspect
of the environmental impact of a proposed action. Second, it ensures that the
agency will inform the public that it has indeed considered environmental concerns
in its decisionmaking process." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d
1062, 1066 (9th Cir. 2002) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def.
Council, Inc.*, 462 U.S. 87, 97 (1983) (internal quotations and citations omitted).
"NEPA is a procedural statute that does not mandate particular results but simply
provides the necessary process to ensure that federal agencies take a hard look at
the environmental consequences of their actions." *High Sierra Hikers Ass'n v.
Blackwell*, 390 F.3d 630, 639–40 (9th Cir. 2004) (internal citations and quotation
marks omitted); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351
(1989) (stating that NEPA "prohibits uninformed—rather than unwise—agency
action").

Before undertaking any "major Federal action significantly affecting the
quality of the human environment," an agency must prepare a detailed
environmental impact statement ("EIS"). 42 U.S.C. § 4332(2)(C); 40 C.F.R.
§ 1508.11. In order to decide whether a project is a "major Federal action

3

significantly affecting" the environment therefore requiring an EIS, an agency may prepare an environmental assessment ("EA"). 40 C.F.R. § 1508.9. An EA is a "concise public document" that "briefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement." *Id.* "NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail." 40 C.F.R. § 1500.1(b). If the EA concludes that the proposed action will not have a significant effect on the environment, the agency may issue a Finding of No Significant Impact and may then proceed with the action without the need for an EIS. 40 C.F.R. § 1508.13.

## II.     The National Forest Management Act

The National Forest Management Act ("NFMA") requires forest planning of national forests at two levels: the forest level and the individual project level. 16 U.S.C. §§ 1600–1687. At the forest level, NFMA directs the Department of Agriculture to "develop, maintain, and, as appropriate, revise [forest plans] for units of the National Forest System." 16 U.S.C. § 1604(a). A forest plan sets broad guidelines for forest management and serves as a programmatic statement of intent to guide future site-specific decisions within a forest unit. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003); *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729 (1998). Forest plans must "provide for multiple use and sustained yield of the products and services" derived from the

national forests, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). At the individual project level, NFMA requires that each individual project be consistent with the governing forest plan. *Great Old Broads for Wilderness v. Kimbrell*, 709 F.3d 836, 851 (9th Cir. 2013).

The Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003). This deference may be set aside only where an agency takes a position that is "contrary to the clear language" of the forest plan. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 962 (9th Cir. 2005).

## III. The Endangered Species Act

The Endangered Species Act ("ESA") "requires the Secretary of the Interior to promulgate regulations listing those species of animals that are 'threatened' or 'endangered' under specified criteria, and to designate their 'critical habitat.'" *Bennett v. Spear*, 520 U.S. 154, 157–58 (1997) (citing to 16 U.S.C. § 1533). The ESA also requires each federal agency to ensure that an agency action is not likely to "jeopardize the continued existence" of a threatened or endangered species. 16 U.S.C. § 1536(a)(2). An "action" is "all activities or programs of any kind authorized, funded, or carried out . . . by Federal agencies." 50 C.F.R. § 402.02.

To ensure compliance with this mandate, the ESA's implementing regulations outline a detailed process to ensure that the action agencies consult with an appropriate expert agency—here, the Fish and Wildlife Service ("FWS"). The agency's first step in complying with Section 7 is to obtain from FWS "a list of any listed or proposed species or designated or proposed critical habitat that *may be present* in the action area." 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c)–(d) (emphasis added). If FWS advises that these species or their habitat "may be present," the Forest Service must complete a biological assessment ("BA") to determine if the proposed action "may affect" or is "likely to adversely affect" the listed species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.12(f), 402.14(a), (b)(1); *Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006). If the Forest Service determines that an action "may affect" a listed species, the Forest Service must consult with FWS under Section 7 of the ESA. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012). Consultation may be formal or informal. 50 C.F.R. § 402.14; *Karuk Tribe of Cal.*, 681 F.3d at 1027. Formal consultation is obligatory where the Forest Service determines that an action is "likely to adversely affect a listed species." 50 C.F.R. § 402.14 (a)–(b). But where the Forest Service determines that an action "may affect . . . [but is] not likely to . . . adversely affect[]" a listed species, the Forest Service may initiate informal consultation. 50 C.F.R. §§ 402.14(a), 402.12(a). If FWS concurs with the Forest

6

Service's determination that a listed species "is not likely to be adversely affected," both agencies have fulfilled their respective obligations and the federal action may proceed. 50 C.F.R. § 402.13(a).

## IV. The Administrative Procedure Act

Under the Administrative Procedures Act ("APA"), a Court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Where this standard is met, the APA authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* at § 706(1).

Under this standard:

[A]n agency must examine the relevant data and articulate a satisfactory explanation for its action. An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law.

*Organized Village of Kake v. U.S. Dep't of Agric.*, 746 F.3d 970, 974 (9th Cir. 2014) (internal citation and quotation marks omitted).

While the APA requires a "thorough, probing, in-depth review" of agency action, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), the standard of review is nonetheless "highly deferential," *Nw. Ecosystem All. v.*

*U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007). If the court finds the existence of a reasonable basis for the agency's decision, it must presume the validity of, and affirm, the agency action. *Id.*

## V.    Summary Judgment

A party is entitled to summary judgment if it can demonstrate that "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

"[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether [an] agency could reasonably have found the facts as it did" based upon the "evidence in the administrative record." *City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (citations omitted). Generally, cases involving review of final agency action under the APA do not involve fact finding but only a review of the administrative record to which Plaintiffs and Defendants have stipulated. *Nw. Motorcycles Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). Therefore, resolving this case on summary judgment is appropriate.

### DISCUSSION

Plaintiffs argue that the North Hebgen Project violates NFMA, NEPA, ESA,

and APA. Specifically, Plaintiffs assert that: (1) the Forest Service was required to analyze the Project's effects on wolverine in a BA and receive concurrence from FWS and failed to do so; (2) the Forest Service's calculation of elk hiding cover violates the Forest Plan; and (3) the Forest Service failed to conduct an EIS where the project raises a "substantial question" that it will have a "significant effect on the environment." (Doc. 41.)[1] For the reasons explained below, Plaintiffs will prevail on their first two claims. Defendants will prevail on the final claim.

## I. The Wolverine Claim

Plaintiffs argue that the Forest Service violated the ESA and APA by failing to complete a site-specific BA for wolverine and for failing to receive concurrence from FWS on the Project's effects on wolverine. (Doc. 41 at 20.) Wolverine, a proposed listed species, is present in the Project area. A5:0002236. Defendants assert that the Forest Service discharged its ESA duties with respect to wolverine in its 2014 programmatic BA, for which the Forest Service received FWS's concurrence (Docs. 52 at 19; 56 at 22), and through the site-specific documents, although these did not receive concurrence (Doc. 52 at 21–22). Alternatively,

---

[1] The parties agree that Plaintiffs' first claim—that the agencies violated the ESA and APA by failing to consult on lynx and lynx critical habitat for Amendment 51 to the Forest Plan—is moot because the agencies have now completed a BA and biological opinion for Amendment 51. (Docs. 52 at 14; 59 at 7; 69 at 8.) The Court agrees and will dismiss this claim. The Court will also deny Plaintiffs' motion to supplement the administrative record with respect to Exhibits 1 and 2 which Plaintiffs contend "provide support for the finding that lynx are an old growth associated species." (Doc. 44 at 4.) As these Exhibits pertain only to the lynx consultation claim, the Court need not consider them.

Defendants assert that no BA was required because the Project is not a major construction activity. (Docs. 52 at 23; 56 at 27; 69 at 9.)

The threshold issue is whether the Forest Service had any obligation to prepare a BA for wolverine in the first place. In addressing this issue, it does not matter that wolverine are a proposed species rather than a listed species. *See* 16 U.S.C. § 1536(c)(1) (imposing a BA obligation with reference to both proposed and listed species). Nor does it matter that the Forest Service completed a BA for the listed species present in the Project area. When it comes to federal actions that are not major constructive activities, if the ESA imposes no duty on the agency other than its obligation to ensure no jeopardy, the Forest Service's decision to undertake a BA is wholly discretionary and its decision not to include wolverine is not arbitrary and capricious.

Section 7 of the ESA, from which the consultation and conference obligation arises, imposes the agency's BA obligation. 16 U.S.C. § 1536(c)(1).[2] Referring to "any agency action," the statute requires a BA when an action agency receives information that proposed or listed species "may be present" in the project area. *Id.* The regulations addressing the consultation requirement explain that the agency is "required" to "prepar[e]" a BA for federal actions that are "major

---

[2] Throughout this Order, 16 U.S.C. § 1536(c)(1) will be referred to as the "BA provision," or simply "the statute."

construction activities." 50 C.F.R. § 402.12.[3] On its face, this describes a smaller subset of federal actions for which a BA is required. While major construction activities certainly fall within the ambit of "any agency action," 16 U.S.C. § 1536(a)(2) (defining "agency action" as "any action authorized, funded, or carried out by such agency"), the question is whether the regulation imposes a limitation on the agency's duty, as Defendants assert.

At first glance, interpreting the regulation to provide that a BA is *not* required when an action is *not* a major construction activity commits the fallacy of the inverse. Logic alone does not support this reading. Yet Defendants cite considerable support for their interpretation that a BA is required only for major construction activities. Although there is no binding law on point, Defendants point to the Federal Register rule approving the 1986 ESA regulations. Eight years after the BA provision was enacted, the agency proposed a set of regulations that addressed the agency's BA obligation including the regulation referring to "major construction activities." 51 Fed. Reg. 19,926 (1986). During the notice and comment period, members of the public argued that "the limitation to construction projects and other undertakings having similar physical impacts[] [was] arbitrary and without legal basis." 51 Fed. Reg. at 19936. Dismissing this concern, the agency asserted that this limitation reflected Congress's intent when it passed the

---

[3] This Order will refer to 50 C.F.R. § 402.12(b)(1) as "the regulation."

11

BA provision, citing to a statement contained in the House Conference Report to the ESA's 1979 amendments.[4] *Id.* (citing H.R. Conf. Rep. No. 697, 96th Cong., 1st Sess. 13 (Dec. 11, 1979)). The Federal Register clarified that the regulation reflected the agency's understanding of the statute as limited to "major construction activities." 51 Fed. Reg. at 19936 ("Whether a Federal action is a major construction activity, as defined in these regulations, is the standard used for determining whether a Federal agency must prepare a biological assessment."). The majority of courts that have addressed this issue endorse the agency's interpretation.[5] However, this is not the end of the matter.

As Plaintiffs note, the Court is not bound to give deference to an agency's interpretation where it is contradicted by the plain language of the statute. *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 733 (9th Cir. 2017). When it comes to actions that are not major construction activities, Plaintiffs assert that the agency's interpretation of the BA requirement conflicts

---

[4] The 1979 ESA amendments occurred a year after the Congress enacted the BA provision.
[5] *E.g.*, *Newton Cty. Wildlife Ass'n v. Rogers*, 141 F.3d 803, 811 (8th Cir. 1998) ("The Wildlife Association argues the Forest Service was required to prepare biological 'assessments' to decide whether to consult with the Fish and Wildlife Service. However, a biological assessment is only required for 'major construction activities.'") (internal citations omitted); *Los Padres Forestwatch v. U.S. Forest Serv.*, 776 F. Supp. 2d 1042, 1045 (N.D. Cal. 2011) ("If [listed species are present], and if the action constitutes a 'major construction activity,' then the agency is required to produce a 'biological assessment' (or 'BA') in accordance with ESA 'for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action.'"); *Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency*, 11 F. Supp. 2d 529, 544 (D.V.I. 1998) ("Contrary to Plaintiffs' allegations, FEMA was not required to prepare a BA in connection with the proposed housing project. The Federal Regulations state that a BA is required only for 'Federal actions that are 'major construction activities.'").

12

with the agency's otherwise broad statutory obligation to prepare a BA for "any agency action" where proposed and listed species "may be present." (Doc. 79 at 8.) Defendants, on the other hand, assert that the statute "accommodates no other reading" than the one endorsed by the agency. Defendants argue that their interpretation prevails under both steps of the *Chevron* framework, first, because the statute unambiguously conveys Congress's intent, and second, because the agency's interpretation is reasonable and requires deference. (Docs. 82 at 6; 83 at 7.)

In reviewing an administrative interpretation of a statute, the first step is to ascertain whether Congress has clearly spoken on the issue. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984). If the statute is clear, that is the end of the matter. *Id.* at 843. The court will follow Congress's "unambiguously expressed intent" regardless of the agency's interpretation. *Id.* However, if the statute is ambiguous, the court will look to the agency's interpretation. *Id.* When it comes to Congress's delegation of rulemaking authority under the ESA, the second step requires a court to defer to the agency's interpretation unless it is arbitrary and capricious. *Nw. Ecosystem All.*, 475 F.3d at 1141–43.

Turning to step one, the starting point is the text. Section 7 provides:

(c) **Biological assessment**

(1) To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on November 10, 1978, request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. Such assessment shall be completed within 180 days after the date on which initiated . . . and, before any contract for construction is entered into and before construction is begun with respect to such action.

Defendant-Intervenor asserts that the statute unambiguously requires a BA for "any agency action" (after the date of enactment) that involves construction contracts or construction activities—based on the statute's repeated use of the word "construction." (Doc. 83 at 12.) From there, Defendant-Intervenor leaps to the conclusion that a construction contract or activity as referenced in the statute means a "major construction activity" as defined in the regulation. If a construction activity and a major construction activity were obviously synonyms, the latter would not need a modifier.[6]

---

[6] Defendants further observe that, in the statute's procedures outlining steps for obtaining an exception for actions likely to affect a listed species, the applicant must meet various procedural requirements, including "conduct[ing] any biological assessment required by subsection (c)." 16 U.S.C. § 1536(g)(3)(A)(ii). Defendants note that this language indicates that certain projects do not require a BA—or else the language would read "conduct a BA" rather than "any required" BA. (Docs. 83 at 13; 82 at 9.) Defendants are correct that subsection (g) indicates that there is both a permissive and mandatory scope to the BA provision. However, Defendants do not support their argument that a BA becomes mandatory only when a project is a "major construction activity." The permissive scope could reference: (1) a project underway before the

14

The lack of textual support for the agency's interpretation is apparent by Federal Defendants' attempt at a textual argument: parsing the statute sentence by sentence, Federal Defendants assert that the agency's duty to prepare a BA is triggered only after it receives confirmation of a protected species in the area and then "decide[s] whether the proposed action is a 'major construction activity' as defined by 50 C.F.R. § 402.02" as a precursor to the statute's second sentence. (Doc. 82 at 8–9.) Contrary to implication, the major-construction-activities language does not appear anywhere in the text. The question at this juncture is not whether the regulation can be harmonized with the text of the statute but whether the text itself embraces the notion that a BA is limited to major construction activities. Plainly, it does not.

Defendant-Intervenor next asserts structural support for its interpretation. If a BA were required for "any agency action," it asserts that the result is "inconsistent with the law in the Ninth Circuit that no consultation is required if a project will have no effect on a listed species." (Doc. 83 at 14.) It is true that, in the Ninth Circuit, a no effect determination for a listed or proposed species discharges the agency's consultation obligations. *Pac. Rivers Council v. Thomas,*

<hr />

statute's date of enactment; (2) an agency action which fails the definition provided in 16 U.S.C. § 1436(a)(2); or (3) Defendants may be correct that the BA provision contains an implicit construction requirement. Resolving this issue is not necessary here, as the Project does not implicate subsection (g).

30 F.3d 1050, 1054 n.8 (9th Cir. 1994). However, a no effect determination does not obviate the need for a BA, as the BA is the mechanism by which an agency concludes that its proposed action will have "no effect," "may affect," or "is likely to adversely affect" a listed or proposed species. *See* 16 U.S.C. § 1536(c)(1). Defendant-Intervenor's argument is therefore groundless.

That Defendants struggle to provide a compelling textual interpretation that supports the agency's view is unsurprising, given that the statute governing the preparation of a BA is straightforward and clear. Under subsection (c)(1), the text (as pertinent) provides:

> each Federal agency shall, with respect to *any agency action* . . . request of the Secretary . . . whether any species which is listed or proposed . . . may be present in the area of such proposed action. *If* the Secretary advices . . . that *such species may be present, such agency shall conduct a biological assessment* . . . .

*Id.* § 1536(c)(1) (emphasis added). The plain language of the statute itself requires a BA where two simple conditions are met: there must be (1) a federal agency undertaking "any agency action;" and (2) this agency must receive information that proposed or listed species "may be present" in the action area. Contrary to Defendants' contention, agency action is not limited to construction actions because it is defined elsewhere as "any action authorized, funded, or carried out by such agency[.]" 16 U.S.C. § 1436(a)(2). When the Ninth Circuit interpreted this language prior to the agency's promulgation of the 1986 regulations, it held that

"[o]nce an agency is aware that an endangered species may be present in the area of its proposed action, the ESA requires it to prepare a biological assessment to determine whether the proposed action is 'likely to affect' the species." *Thomas v. Peterson*, 753 F.2d 756, 763 (9th Cir. 1985). The Ninth Circuit read no "construction" or "major construction" prerequisite into the agency's duty to prepare a BA.

Further, adopting such an interpretation is structurally inconsistent with the purpose of the ESA. As set forth in the congressional findings, the purpose of the ESA is to ensure that economic development does not eclipse the federal government's commitment to the preservation of threatened and endangered species. 16 U.S.C. § 1531(a)(1). To meet this duty, the ESA imposes an obligation on agencies to consult with fish and wildlife scientists to ensure that proposed actions do not jeopardize such species. 16 U.S.C. § 1536(a). This species-specific inquiry is separate from the agency's analysis under NEPA— although there is considerable overlap. *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1219 (11th Cir. 2002). The BA process itself does not place an onerous burden on the action agency. *See Karuk Tribe of Cal.*, 681 F.3d at 1020. It places an appropriate burden of analysis and communication. *Id.* Where listed or proposed species "may be present," agencies must assess the risk of their action to those species and receive expert feedback. *Id.* If the risk to species is deemed

17

minimal, then the consultation obligations are discharged once the fish and wildlife agency informally concurs. *Pac. Rivers Council*, 30 F.3d at 1054 n.8.

Defendant's interpretation would vastly limit the number of projects for which an agency is required to prepare a BA. A "major construction activity" is defined in the regulations as an action with requires the preparation of an EIS. 50 C.F.R. § 402.02. An EIS is a comprehensive document that provides a "full and fair discussion of significant environmental impacts" including "reasonable alternatives which would avoid or minimize adverse impacts" as supported by "environmental analysis." 40 C.F.R. § 1502.1. The EIS is a planning document, creating in collaboration with agency scientists designed to mitigate a project's harm to the environment. In many respects, an EIS already captures the sort of inquiry contained in the BA—at least, as it pertains to specific species. *See Pac. Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012, 1032 (9th Cir. 2012), *vacated as moot,* 570 U.S. 901 (2013) (explaining that a BA cannot take the place of analysis required in an EIS but treating the two as analytically similar). In the Eleventh Circuit, an agency's creation of an EIS discharges any need for a BA entirely. *Sierra Club*, 295 F.3d at 1219.

An EA, on the other hand, is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." *Blue Mountains Biodiversity Project*

*v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). While potential harm to species is one of ten factors that could compel the agency to prepare an EIS rather than an EA, 40 C.F.R. § 1508.27, the decision to conduct an EIS is largely discretionary and potential harm to species is not necessarily dispositive of the matter. For projects where the agency determines that an EIS is not necessary *despite* potential harm to species, the agency's interpretation discharges any further need to prepare a BA. Isn't this the very circumstance where further species-specific analysis is essential?

The agency's interpretation undermines the consultation purpose of Section 7 because it requires a BA in circumstances where the analysis is potentially superfluous (actions which are major construction activities), and does not require additional analysis under circumstances where harm to a species may be contemplated but a project is, by definition, receiving abbreviated analysis and feedback. This interpretation strips the consultation obligations of its teeth. Moreover, given the significant number of Forest Service logging and timber sale projects that do not receive treatment in an EIS, requiring a BA only where a project is a major construction activity eviscerates the scope of the agency's otherwise broad duty to prepare a BA for "any agency action." The Court is unable to reconcile the agency's interpretation of the regulation with the purpose of the ESA or a textual reading of the statute.

Nevertheless, Defendants urge the Court to look beyond the text and consider the legislative history of the statute. Federal Defendants assert that the ESA's 1978 amendment (which created the BA obligation) was enacted in response to the *T.V.A.* case—an ESA challenge to the federally funded Tellico Dam—and that testimony and floor debate during passage demonstrate that Congress "focused almost exclusively on major construction activities." (Doc. 82 at 10–11 (referring to *Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978).) Federal Defendants point to numerous floor statements made during the House's ESA appropriations subcommittee hearing that reflect that Congress had construction projects in mind when it discussed the proposed amendment. (*See* Doc. 82 at 14 (citing *Endangered Species Oversight: Hearing on H.R. 10883 Before the H. Subcomm. on Fisheries & Wildlife Conservation & the Env't*, 95th Cong. 20 (1978).) This focus on construction activities is apparent from the text of the BA provision so it is unclear what additional context Federal Defendants believe the legislative record provides. Plaintiffs respond by claiming that Federal Defendants' reliance on statements made during passage of H.R. 10883 is incorrect as it was H.R. 14104 that specifically pertained to passage of the BA provision. (Doc. 84 at 12–13 (citing H.R. Res. 1423, 95th Cong. (1978) (enacted), *reprinted in* 124 Cong. Rec. H13357 (Oct. 13, 1978).) Plaintiffs note that the summary of

discussions pertaining to H.R. 14104 convey no indication that Congress intended to require a BA only for major construction activities.

On one hand, Federal Defendants assert that statements made during the legislative process provide inferential support for their reading of the statute. On the other, Plaintiffs contend its reading is correct based on the absence of any discussion to the contrary. Significantly, neither party points to any statement contained in the legislative records that unambiguously speaks to the precise issue here. The Court will not allow ambiguous legislative statements to cloud its reading of an otherwise clear statute.

Finally, Defendants argue that a statement made during passage of the 1979 ESA amendments "confirms Congress's unambiguous intent to limit its 1978 BA requirement to 'major construction activities.'" (Doc. 82 at 15.) Section 4(4) of the House Conference Report contains the first legislative use of the term "major" to describe the ESA's BA requirement. Referencing the BA provision (enacted the prior year), the Report indicates that "existing law requires federal agencies to conduct biological assessments on major federal actions initiated after November 10, 1978 and designed primarily to result in the building or erection of dams, buildings, pipelines and the like." H. Rep. No. 96-697, at 13 (1979). Federal Defendants erroneously assert that a post-enactment legislative statement is no less persuasive to discern Congress's intent than a contemporaneous account. (Doc. 82

at 16.)  While subsequent *legislation* may be entitled to persuasive weight, subsequent *statements* contained in a conference report indicating what a particular Committee believes an earlier statute to mean is "an extremely hazardous basis for inferring the meaning of a congressional enactment." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980).  Accordingly, the Court gives the 1979 House Conference Report no interpretive weight.

Having undertaken review of these legislative documents, the Court finds no support for Defendants argument that the statute is ambiguous under the first step of the *Chevron* framework.  Congress's meaning, as derived from the text, is clear. The Court is therefore bound to follow the statute without regard to agency's interpretation. *Chevron, U.S.A., Inc.*, 467 U.S. at 843.

Nevertheless, Plaintiffs provide a compelling argument that it is not the agency's enactment of the regulation that is problematic, but rather its interpretation of it.  In *Swan View Coalition v. Weber*, 783 F. App'x 675 (9th Cir. 2019), the Ninth Circuit responded to the same arguments advanced in this litigation.  Its unpublished memorandum disposition explains:

> [i]t may well bet that the "major construction activities" language is not a broad limitation of the applicability of the regulation but an explanation of how the regulation applies to such activities in particular. If so, then the regulation does not relieve agencies of the obligation to conduct a biological assessment for actions other than "major construction activities."

*Id.* at 678 n.l.

Unlike the agency's, the Ninth Circuit's interpretation is logically consistent with the text of the regulation. Simply because the regulation requires a BA for major construction activities does not mean that it excuses the Forest Service from preparing a BA for projects that are not major construction activities. Interpreting the regulation as a non-exhaustive example of a circumstance when a BA is required harmonizes the regulation with the agency's statutory duty.

Here, the North Hebgen Project falls within the definition of "any agency action." The Forest Service received information from FWS that wolverine "may be present" in the Project area. *See* A5:0002236. These two facts trigger the Forest Service's obligation to prepare a BA for wolverine. Having so concluded, the Court turns to Federal Defendants' contention that the Forest Service fulfilled its consultation obligation through the programmatic BA and site-specific analysis.

The programmatic and site-specific documents each contain a fatal defect. The programmatic BA is insufficient to meet the Forest Service's obligation to address the "direct and indirect effects of an action on the species . . . together with the effects of other activities that are interrelated or interdependent with that action," 50 C.F.R. § 402.02, because it is too general. The site-specific analysis contained in the EA and Wildlife Report, while tailored to the Project, did not fulfill the agency's consultation obligations because it did not receive FWS concurrence. And, because the site-specific analysis does not equate to a "no

23

effect" determination, Defendants cannot argue that no further conference or consultation was required from FWS. Nor can they argue that FWS's programmatic concurrence satisfied as a site-specific concurrence because FWS never examined the Project's potential effects on wolverine.

The programmatic BA is inadequate because it is a brief document that covers a large area and addresses the science pertaining to wolverine's potential for extension in very general terms. *See* NH 025880–92. The 12-page document covers all of Region 1, which encompasses 11 national forests across four states. NH 025882–83. The programmatic BA asserts that the wolverine face only two threats to their survival: climate change (the primary threat), and harvest (the secondary threat). NH 025887. Because wolverine are generally thought to be adaptable across habitat features and because most forest treatment activities occur in lower elevations (and wolverine tend to prefer high elevation habitat), the BA concludes that general forest treatment activities are not a threat to wolverine's survival. NH 025885. The BA then contains the following disclaimer: "some of the activities listed in the proposed action [such as timber harvest, mechanical equipment use, silvicultural treatments, range management, prescribed fire, weed control, etc.] have the potential to affect individual wolverines and/or their habitat, but not to the level of jeopardizing the continued existence of the wolverine." *Id.* The disclaimer is effectively a concession that further site-specific analysis is

required to determine the effects of a particular project on local wolverine populations.

Despite the programmatic BA's assessment that most forest treatment activities do not occur in wolverine habitat, the Project EA discloses that "the entire project area is located in suitable dispersal habitat for both male and female wolverine." NH 000236. This alone is sufficient to take the Project outside the scope of the analysis contained in the programmatic BA. Moreover, the EA concludes that "individual project activities and cumulative actions will result in relatively small-scale disturbances in relation to the large wolverine home range size." NH000238. Although the EA does not use the same terminology as a BA, this is effectively a determination that the Project "may affect," but "is not likely to adversely affect" wolverine. Even assuming that the minimal analysis contained in the various site-specific documents satisfied the Forest Service's obligation to prepare a BA, its consultation obligations are still outstanding. A determination that a project "may affect" a listed species requires FWS's concurrence. 50 C.F.R. §§ 402.14(a), 402.12(a). The Forest Service's failure to obtain such concurrence is arbitrary and capricious.

## II.    The Elk Claim

Plaintiffs argue that the Project violates NFMA and NEPA because the Forest Service failed to accurately calculate elk hiding cover according to the terms

of the Forest Plan.[7] (Doc. 41 at 31–32.) Federal Defendants argue that the Court lacks jurisdiction over this claim because it is not administratively exhausted, and that Plaintiffs waived this claim by failing to raise it in their opening brief. (Docs. 52 at 27; 68 at 12.)

Before bringing a claim in federal court, a plaintiff must first exhaust its available administrative remedies. *Great Old Broads*, 709 F.3d at 846 (citing to 5 U.S.C. § 704). It is "inappropriate" for a federal court to review a claim that was not first presented in the administrative process. 36 C.F.C. § 218.14(b); *see also* 7 U.S.C. § 69129(e) and 16 U.S.C. § 6515(c). The purpose of this requirement is to allow the "agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention[.]" *Great Old Broads*, 709 F.3d at 846. A plaintiff's failure to exhaust remedies as to a specific claim subjects the claim to dismissal. *Oregon Nat. Desert Assoc. v. Jewell*, 840 F.3d 562, 571–74 (9th Cir. 2016).

---

[7] This argument evolved over the course of briefing. Initially, Plaintiffs claimed that the Forest Service's calculation of elk hiding cover lacked a complete data set and failed to disclose this deficiency. (Doc. 41 at 33.) In response, Federal Defendants asserted that the elk hiding cover analysis referred to the Wildlife Report which disclosed the lack of comprehensive data. (Docs. 52 at 33; 56 at 33.) Additionally, they submitted the Declaration of Randall Scarlett which provided, for the first time, a thorough explanation of the Forest Service's method for calculating elk hiding cover. (Doc. 52-2.) Plaintiffs now contend that the elk hiding cover analysis violates NFMA because it excludes non-Gallatin National Forest lands. (Doc. 59 at 19.) At oral argument, Plaintiffs confirmed that they have abandoned their initial position. The Court will therefore address only the latter argument.

In the context of national forest timber sale litigation, members of the public may "alert[] the decision maker to the problem in general terms, rather than using precise legal formulations." *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002). However, the claims raised during the administrative process must be "so similar to the claims that the district court can ascertain that the agency was on notice of, and had the opportunity to consider and decide, the same claims now raised in federal court." *Great Old Broads*, 709 F.3d at 846–47.

During the administrative objection period, Plaintiffs noted that the Project EA did not clearly state "how the percentage of [elk analysis unit] habitat effectiveness, security, and hiding cover were calculated, what numbers were used and how they conform to the Forest Plan standards." NH 001010.

The Forest Plan standard specifies both a method and a result. The result dictates that all vegetation treatment projects shall maintain at least two-thirds forest cover with 40% canopy cover. NH 001988. The method indicates that the two-thirds ratio shall be calculated by including only vegetation types capable of providing elk hiding cover, excluding non-forest service lands, and using the elk analysis unit as the denominator. *Id.* Because the Project EA provided only conclusory statements regarding its elk hiding cover analysis, *see* NH 000260, Plaintiffs lacked the information necessary to bring a more specific claim during the notice and comment period. However, its claim that the Forest Service failed

to accurately calculate elk hiding cover by failing to use the entire elk analysis unit as a denominator—in essence, a claim regarding the Forest Service's method of calculation—is captured in general terms by its concern that the Project does not "conform to Forest Plan standards." Given the lack of transparency surrounding the method of calculation provided in the EA,[8] Federal Defendants cannot now claim that Plaintiffs failed to raise their concerns with sufficient clarity to allow the Forest Service to address those concerns during the administrative process. Plaintiffs' claim is administratively exhausted.

Additionally, the Court will exercise its discretion to hear this claim. While ordinarily, a litigant waives any claim not raised in its opening brief, *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992), an exception applies where the "failure to raise the issue properly did not prejudice the defense of the opposing party," *Sharemaster v. SEC*, 847 F.3d 1059, 1070 (9th Cir. 2017). Here, Plaintiffs' current elk hiding cover claim closely resembles its initial claim in that both iterations alleged that the Forest Service calculated elk hiding cover using incomplete

---

[8] For example, the EA itself must be read in conjunction with the Wildlife Report in order to establish that elk hiding cover was calculated based on modeled data and that this data was incomplete. *Compare* NH 000258 *with* NH 003424. The EA does not include the map indicating which portions of each elk analysis unit were considered in the hiding cover calculations. *See* NH 003515. Nor does the EA disclose that the Forest Service calculates hiding cover using the method prescribed in the "Gallatin Forest Plan Hiding Cover Standard Assessment." NH 020092. This was disclosed in the Scarlett Declaration which was submitted with Federal Defendants' cross motion for summary judgment only after the Forest Service realized there was a mistake in the Project's calculation of elk hiding cover in the first place. (Doc. 52-2 at 3.)

information. Defendants cannot claim prejudice when they responded to Plaintiffs current claim in their reply briefs (Docs. 68 at 14–18; 69 at 17–21), and addressed it at oral argument, *United States v. Salmon*, 792 F.3d 1087, 1090 (9th Cir. 2015).

Turning to the merits, the Gallatin National Forest Plan standard states:

> Vegetation treatment projects (e.g. timber harvest, thinning and prescribed burning) shall maintain at least two-thirds (2/3) of Douglas fir, lodgepole pine, and subalpine fir conifer forest cover types (on National Forest System lands) with at least 40% canopy cover (on National Forest Systems lands), to function as hiding cover[9] for elk at any point in time. Hiding cover will be assessed for an elk analysis unit (EAU) which is based on a collaborative mapping effort between the local state (MDFWP) wildlife biologist and the local Forest Service wildlife biologist.

NH 001988. Put simply, the Forest Plan requires that every project maintain a certain percentage (two-thirds) of dense forested areas (40% canopy cover) across each elk analysis unit.

Plaintiffs argue that the Forest Service failed to accurately calculate hiding cover because it did not use the entire elk analysis unit as a denominator. While the Project occurs only on Gallatin National Forest lands, the Project area transects three elk analysis units: the Buffalo Horn EAU, the Cabin Creek EAU, and the Henry's Mountain EAU. (Doc. 52-2 at 3.) These three elk analysis units include

---

[9] "Hiding cover" is "vegetation capable of concealing 90% of a standing adult big game animal from the view of a human at a distance equal to or less than 200 feet; generally any vegetation used by big game for security or escape from danger . . . [H]iding cover is provided by tree species or species mixes that are naturally capable of having relatively dense (>40%) canopy cover." NH 003424.

lands on the Caribou-Targhee and Beaverhead-Deerlodge National Forests in addition to the Gallatin National Forest. E1:003515. When the Forest Service calculated elk hiding cover for the Project, they did so only for those portions of each elk analysis unit that fell within the Gallatin National Forest.[10] It goes without saying that in order to accurately calculate a percentage, one must accurately measure the whole. The Forest Plan specifies that the denominator (or whole) by which the two-thirds standard must be maintained is the "elk analysis unit."

Defendants argue that the Forest Service reasonably interprets the phrase "National Forest System lands" to mean Gallatin National Forest lands *only* and that this interpretation is entitled to deference.[11] (Doc. 68 at 14, 17.) The Court

---

[10] When the Forest Service initially calculated elk hiding cover for the EA, it included "private lands, National Park lands, and other non-Gallatin National Forest lands" into the "baseline hiding cover and existing hiding cover" for the three analysis units. (Doc. 52-2 at 5.) After this litigation commenced, the Forest Service reexamined its elk hiding cover calculations and determined there was an error in the method of calculation. The Forest Service then "recalculated" hiding cover by excluding "private lands, National Park lands, and other non-Gallatin National Forest lands" from the baseline and determined that because the new calculations were substantially similar to the old ones, any error was harmless. (Doc. 52 at 34–36.) In evaluating whether the Forest Service's calculation of elk hiding cover violates NFMA, the Court will consider only the calculation that it currently advances. (*See* Doc. 52-2 at 6.)

[11] At oral argument, the parties disputed whether the Forest Service was entitled to deference in its calculation/interpretation of the Forest Plan. Federal Defendants argue that the Forest Service is entitled to "substantial deference" in its interpretation of its Forest Plan. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). However, Plaintiffs correctly contend that the Court does not owe deference to an agency's litigation position, which is what the Forest Service asserts in this case. At any rate, deference is only owed to the extent that the Forest Service's interpretation is not "plainly inconsistent" with the Forest Plan. *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012).

agrees that this interpretation is reasonable and entitled to deference. This conclusion, however, does not save the Forest Service's calculation of elk hiding cover in this case because the phrase "National Forest Systems land" is not used to limit the denominator.

The Forest Plan requires that all vegetation treatment projects maintain at least two-thirds conifer forest cover "(on National Forest System lands)." Lending this phrase the interpretation advanced by the agency, the two-thirds requirement must be met for all projects on Gallatin National Forest lands. The Plan goes on to state that this two-thirds requirement will apply only to cover types capable of providing elk hiding cover: "Douglas fir, lodgepole pine, and subalpine fir . . . with at least 40% canopy cover (on National Forest System lands)" which, again, means Gallatin National Forest lands. However, the clear language of the Forest Plan provides no such limitation as it applies to "elk analysis units." In arguing that the Forest Plan requires that two-thirds dense coverage be maintained for the portion of each elk analysis unit that falls on Gallatin National Forest lands, Defendants advance an interpretation that is not supported by the text. The language of the Forest Plan instructs that coverage be assessed across the "elk analysis unit." The Forest Service's calculation of elk hiding cover violates NFMA because it fails to comply with the Forest Plan. *Cf. Native Ecosystems Council*, 418 F.3d at 962 (holding a Helena National Forest project in violation of NFMA where the forest

plan required that elk hiding cover be calculated using a "drainage or elk herd unit"
denominator and the agency improper excluded private and non-Helena National
Forest lands from the baseline); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
137 F.3d 1372 (9th Cir. 1998) (holding a Payette National Forest project in
violation of NFMA where the forest plan required that a certain percentage of old
growth habitat be maintained "within each pileated woodpecker home range" and
the agency calculated the project's impacts on old growth for the "analysis area"
rather than the "home range" of the pileated woodpecker).

Federal Defendants argue that it would be inconsistent with the "planning
framework of NFMA" to include non-Gallatin National Forest lands into a
standard mandated by the Gallatin National Forest plan. (Doc. 68 at 17.) This is
not necessarily true. While Federal Defendants correctly observe that the Gallatin
National Forest Plan governs only projects that occur on the Gallatin National
Forest, using the entire elk analysis unit as a denominator does not mean that the
Gallatin National Forest Plan is prescribing a standard for projects on other
national forests.[12] Contrary to Federal Defendants' assertion, the structure of
NFMA does not save the Forest Service's analysis of elk hiding cover in this case.

---

[12] This is not a novel observation. If, for example, a neighboring forest had a forest plan that
required that all forest projects maintain fifty percent hiding cover, and coverage conditions
currently met that standard, any Gallatin National Forest project occurring in an elk analysis unit
that bisects both forests would be required to maintain a higher percentage of elk cover so that
the elk analysis unit *as a whole* maintained the two-thirds standard. In this hypothetical, the
Gallatin National Forest project would permit fewer acres of coverage-reducing treatment than if

Because the language of the plan unambiguously instructs that hiding cover be calculated for the elk analysis unit, the Forest Service's decision to calculate elk hiding cover for only a portion of each elk analysis unit was arbitrary and capricious and violates NFMA.

## III.   The NEPA Claim

Plaintiffs argue that the Forest Services violated NEPA and APA by failing to complete an EIS when the Project raises "substantial questions" about whether it "significantly affects the quality of the human environment." (Doc. 41 at 35.) NEPA requires that federal agencies prepare an EIS for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). To determine whether an action is significant—i.e., whether an EIS is necessary for the proposed action—an agency may first prepare an EA. *Id.* § 1501.4(b). Only if the agency concludes that a project will have "no significant impact" is the agency's duty to prepare an EIS extinguished. *Id.* § 1501.4(e). In order "to prevail on a claim that the Forest Service violated its statutory duty to prepare an EIS, a plaintiff need not show that significant effects will in fact occur. It is enough for the plaintiff to raise substantial questions about whether a project

---

coverage in the neighboring forest were greater. Similarly, if this neighboring forest maintained significantly more than two-thirds cover, a project within the Gallatin National Forest would permit coverage-reducing treatments in excess of one-third so long as the elk analysis unit *as a whole* maintained the requisite two-thirds coverage.

may have a significant effect on the environment." *Blue Mountains Biodiversity Project*, 161 F.3d at 1212.

In determining whether the effects of a project "may be significant" in order to require an EIS, agencies and courts should evaluate "context" and "intensity." 40 C.F.R. § 1508.27. "Context" sets forth the scope of the agency's action and the affected interests. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001). "Intensity," or "severity of the impact," relates to the degree to which the agency action affects the locale and interests identified in the context inquiry, *id.*, and is evaluated through the examination of ten factors identified in the NEPA regulations, 40 C.F.R. § 1508.27(b).

Plaintiffs argue that five of the ten intensity factors are met: the Project's logging of 900 acres of old growth forest is "significant" given that old growth is a "[u]nique characteristics of the geographic area" (factor 3); the Project's intent to "lessen wildfire risk" by commercial logging and thinning in high-elevation wet forests is "highly controversial" (factor 4); the Project's close proximity to the Lonesome Wood and Rendezvous Projects may result in "significant cumulative effects" (factor 7); the Project may adversely affect grizzly bears and lynx, two ESA-listed species (factor 9); and the action violates the ESA and the Gallatin National Forest Plan and therefore "threatens a violation of Federal . . . law or

requirements imposed for the protection of the environment" (factor 10). (Doc. 41 at 35–49.) The Court will address each issue raised by the Plaintiffs in this order.

Turning to the first issue, Plaintiffs contend that the old growth forest across the Project area is a "unique characteristic" that presents a "significant issue" for the Project. (Doc. 41 at 41.) They note that the reduction in old growth forest proposed by the Project prompted the Forest Service to amend the Forest Plan to allow old growth logging. (*Id.*) Plaintiffs additionally argue that community members have expressed that walking through an old growth forest "one has the distinct sense of having entered a holy sanctuary." (*Id.*)

The Court appreciates the importance of old growth forest. However, Plaintiffs fail to cite any authority other than the community members' beliefs to indicate that the presence of old growth forest is "unique characteristic" for NEPA purposes. Even assuming that old growth stands are a "unique" geographical feature, Plaintiffs do not demonstrate that the Forest Service was unreasonable in failing to include old growth forest in its consideration of this issue. FONSI 46. The record adequately establishes that the Forest Service considered the direct, indirect, and cumulative effects of the Project's treatment of 269 acres of old growth forest and additional 639 acres of possible old growth forest.[13] NH

---

[13] The Project proposes treatment in 269 acres of actual old growth forest and proposes an additional 639 acres of treatment in "possible" old growth forest. The "possible" category

000116. In its Finding of No Significant Impact, the Forest Service determined that the Project's effects on old growth were not significant because "old growth forest and over mature forest structure will be maintained at current levels in the Henry's Mountain Range and maintained above levels prescribed for the Gallatin Range in the Gallatin Forest Plan (amended 2015)." NH 000129. Even in the Madison Range where the Project proposes the most significant reduction, the activities reduce old growth by only 0.3%. (Doc. 52 at 43 (citing NH 003978).) Further, the question of whether it was prudent of the Forest Service to alter the definition of old growth in the Forest Plan to permit more logging is not before the Court. *See Robertson*, 490 U.S. at 351 ("NEPA merely prohibits uninformed— rather than unwise—agency action."). Given the Project's limited impact on old growth forest, it was not unreasonable for the Forest Service to have concluded that this factor did not support an EIS.

Plaintiffs next assert that the "underlying premise of the Project that commercial logging and thinning in high-elevation, wet forests will lessen wildfire risk" is highly controversial. (Doc. 41 at 45.) Plaintiffs assert it was unreasonable for the Forest Service to conclude that "the effects of the proposed action are not highly controversial for professional, specialists, and scientists" given the scholarly

---

indicates that the forest "currently contains trees that are near the minimum tree size but may or may not meet other criteria." NH 000116.

research which indicates that "fuel-reduction treatments in high-elevation forests [are] generally unsuccessful in reducing fire frequency, severity, and size[.]" (*Id.* at 46–47 (citing Schoennagel et al. (2004)).

Federal Defendants argue that Plaintiffs have misconstrued the Project's purpose: "The purpose of the Project is not to decrease wildfire risk on the landscape scale" but rather to decrease fuels within the wildland urban interface so that, in the event of ignition, the result would be a low intensity surface fire that would be easier to control. (Doc. 52 at 48–49.) The Court agrees.

Given the Project's focus to reduce fuels within the wildland urban interface, its focus on improving conditions at a popular campground that borders Yellowstone National Park, and its finding 68% of fires in the area are human caused, FONSI 2, it was not unreasonable for the Forest Service to have concluded that the goals of the Project are consistent with the scientific research such that the Project's conclusions are not "highly controversial."

Plaintiffs next contend the Project's close proximity to the adjacent Lonesome Wood and the Rendezvous Trail Projects will result in "cumulative significant effects." Plaintiffs argue that the Project's simultaneous timeline with the Lonesome Wood Project, its potential for spread of invasive weeds, and its impacts on wildlife are all "significant cumulative effects" that required an EIS. (Doc. 41 at 42–45.)

Plaintiffs argument is largely premised on their misunderstanding that the adjacent Lonesome Wood Project is scheduled to occur in the same 8 to 12-year time span. Federal Defendants clarify that the Projects will not occur simultaneously, that the Lonesome Wood Project was anticipated to conclude in the Spring of 2019[14] and the Rendezvous Project has already concluded. (Doc. 52 at 45.) Federal Defendants then demonstrate, with record cites, that the Forest Service conducted a thorough review of the concerns related to invasive weeds and determined appropriate mitigating measures so that the Project would not displace native species.[15] Federal Defendants also assert that grizzly bear and lynx are not likely to be harmed by any cumulative impacts because there is no spatial overlap between the projects. (Doc. 52 at 47 (indicating that the Lonesome Wood Project is located in Bear Management Subunit Henry's Lake #1 and #2 and in the Henry's Lake Lynx Analysis Unit, while the Hebgen Lake Project is located within Bear Management Subunits Madison #1 and #2 and in the Upper Madison Lynx Analysis Unit).) For these reasons, the Forest Service's conclusion that "no

_____

[14] The Court does not have any current information on where this Project stands.

[15] Federal Defendants alternatively argue that the Court should not consider this argument because the report that Plaintiffs rely on with respect to invasive weeds is not a part of the administrative record and, as a "deliberative document" it should not become so. Deliberative materials are not per se excluded, *Ctr. for Biological Diversity v. Bernhardt*, 2020 WL 1130365, at *2–4 (D. Mont. Mar. 9, 2020), and admission here is appropriate given that the document was "before" the agency in reaching its decision. The Court will admit Exhibit 5 into the record. As Federal Defenders do no dispute the Court's admission of Exhibits 3 and 4, those will be admitted as well.

significant cumulative impacts are expected for any resource," FONSI 47, is reasonable.

Plaintiffs assert that "the adverse effects to two ESA-listed species" present in the Project area weighs in favor of an EIS. Despite its conclusion that the Project "may affect" two listed species (grizzly bears and lynx) and a proposed species (wolverine), the Forest Service concluded that the Project did not warrant an EIS because it only proposed activities that complied with the various programmatic guidance to protect these species. FONSI 48–49. Having found that the Forest Service abrogated its duty with respect to wolverine, the Court agrees with Plaintiffs that this factor weighs in favor of an EIS.

Finally, Plaintiffs contend that the Project contains ESA and NFMA violations and therefore required an EIS. The presence of procedural violations does not necessarily give rise to an inference that the Project must have "significant effects." While the Forest Service failed to accurately calculate elk hiding cover as required by the Forest Plan, there is evidence that the Project area amply exceeds the two-thirds standard required under the Forest Plan. Similarly, the Forest Service's procedural error under the ESA does not mean that the Forest Service has violated its substantive duty to ensure that its action does not "jeopardize the continued existence" of wolverine. While the Forest Service ought to have prepared a BA for wolverine and sought FWS concurrence, the

Forest Service met its substantive duty under the ESA by consulting with the area's foremost expert on wolverine to ensure that the Project's specific activities "are not likely to jeopardize the continued existence of the wolverine." NH 000238. Despite the procedural violations, there is no substantive indication that the Project will harm important natural resources. Accordingly, his factor does not weigh in favor of an EIS.

The Ninth Circuit has made clear that even one factor may be enough to require an EIS depending on the circumstances. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2004). However, that is not the case here. The Court has found one of the ten intensity factors present: The Project may affect a listed and proposed species. The Court has also determined that the Forest Service failed to adequately fulfil its consultation obligations by preparing a site-specific BA for wolverine. Where, as here, the Court will require the Forest Service to correct this deficiency and make appropriate adjustments to the Project EA in accommodation of wolverine, it is not necessary to require the agency to prepare a full EIS in order to adequately safeguard the species. Having evaluated each of the factors asserted by Plaintiffs, the Court concludes the Forest Service is not required to prepare an EIS.

## IV.  Remedy

Federal Defendants request that, in the event the Court finds a violation, it order additional briefing on the appropriate remedy.  (Doc. 68 at 29.)  This request will be granted.  The parties will each have an opportunity to briefly explain whether the Project should be vacated.  The Court encourages brevity.

IT IS ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. 40) is GRANTED in part and DENIED in part.  The Forest Service violated the ESA and APA by failing to complete a BA for wolverine and violated NFMA and APA with its calculation of elk hiding cover.  Plaintiffs' Section 7 consultation claim concerning Amendment 51 is DENIED as moot.  Plaintiffs' NEPA claim is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Supplement (Doc. 43) is GRANTED in part and DENIED in part.  Exhibits 1 and 2 are not admitted.  Exhibits 3, 4 and 5 are ADMITTED.

IT IS FURTHER ORDERED that Federal Defendants' Cross Motion for Summary Judgment (Doc. 51) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Defendant Intervenor's Cross Motion for Summary Judgment (Doc. 55) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that the parties may submit additional briefing on the appropriate remedy.

1. Federal Defendants and Defendant-Intervenor may each file a brief on remedy on or before April 8, 2020. This brief is limited to 3,250 words.

2. Plaintiffs may file a response brief on or before April 22, 2020. This brief is limited to 3,250 words.

DATED this 26th day of March, 2020.

Dana L. Christensen, District Judge
United States District Court